

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**06/09/2011**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| JAMES TIMOTHY PETERSON, | § | Case No. 09-39605-H4-7 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |

| | | |
|---|---|---|
| SCOTT CAMERON WISE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | |
| JAMES TIMOTHY PETERSON, | § | Adversary No. 10-03152 |
| | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM OPINION ON COMPLAINT TO DETERMINE
DISCHARGEABILITY OF DEBTS PURSUANT TO 11 U.S.C. SECTION 523(a)**

### I. INTRODUCTION

This suit concerns developing case law about the collateral source rule under Texas law and the "justified under the circumstances" exception to Section 523(a)(6) of the Bankruptcy Code.[1]

Scott Cameron Wise (the Plaintiff) seeks a judgment against the debtor, James Timothy Peterson (the Debtor). Specifically, the Plaintiff requests this Court to enter a judgment declaring that: (a) the Debtor owes a debt to the Plaintiff for damages suffered when the Debtor assaulted him; and (b) the damages flowing from the assault are nondischargeable pursuant to 11 U.S.C. § 523(a)(6). According to the Plaintiff, the Debtor punched him in the mouth, thereby causing damages in the form of medical expenses, among other things. Stated differently, the Plaintiff

---

[1] Reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Any reference herein to "the Code" refers to the United States Bankruptcy Code.

asserts that the Debtor's actions toward him constitute willful and malicious injury under § 523(a)(6).

For his part, the Debtor admits that he struck the Plaintiff, but vigorously denies that his conduct amounts to willful and malicious injury under § 523(a)(6). Therefore, the Debtor contends that any obligation he may have to the Plaintiff is dischargeable.

The trial in this adversary proceeding took place on March 18, 2011, April 5, 2011, April 20, 2011, and May 17, 2011. There were twelve exhibits admitted into evidence: Plaintiff's Exhibits 1–10 and Defendant's Exhibits 1 and 2. Ten witnesses testified at the trial. After closing arguments were made, the Court took the matter under advisement.

The Court now makes the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7052. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

## II. POSTURE OF THE MAIN CHAPTER 7 CASE

On December 18, 2009, the Debtor filed his Chapter 7 bankruptcy petition (the Petition Date). The Debtor, in Schedule F, represented that the Plaintiff is an undisputed, unsecured creditor in the amount of $100.00. [Schedule F, Main Case Doc. No. 1]. On January 27, 2010, the first meeting of creditors was held. Pursuant to Bankruptcy Rule 4007(c), the deadline for filing any complaints to determine dischargeability was March 29, 2010. The Plaintiff met this deadline when he filed his complaint against the Debtor on March 29, 2010. [Adv. Docket No. 1]. No other creditor filed any complaints against the Debtor, and therefore, on May 12, 2010,

2

the Debtor received a discharge of his debts with one exception: he did not receive a discharge of the claim now brought by the Plaintiff in this adversary proceeding. [Main Case, Doc. No. 43]. Whether the Debtor receives a discharge of this particular claim is determined through the resolution of this adversary proceeding. This Court now issues this Memorandum Opinion to explain its ruling on this matter.

### III. CREDIBILITY OF WITNESSES

The Court heard testimony from ten witnesses. Of these ten persons, six gave testimony about the circumstances that occurred at a holiday party on December 5–6, 2009, leading up to the Debtor punching and knocking out the Plaintiff. These six witnesses are: (1) the Plaintiff; (2) the Debtor; (3) Noel Pilegge, who is dating the Plaintiff; (4) Julia Wise, the Plaintiff's ex-wife who had an adulterous relationship with the Debtor prior to her divorce from the Plaintiff and has continued that relationship with the Debtor; (5) Vicky Rocher, a friend of Julia Wise who occasionally socialized with Ms. Wise and the Debtor; and (6) Shaun Logsdon, who was dating Ms. Rocher and also occasionally socialized with Ms. Wise and the Debtor.

These six witnesses gave either conflicting or inconsistent testimony on certain important events that occurred at the party. For example, the Plaintiff and Ms. Pilegge both testified that the Debtor suddenly jumped in front of them after they departed the party and were walking down the driveway of the Rapier residence; the Debtor started verbally abusing the Plaintiff; and then the Debtor punched him in the mouth, knocking him out [March 18, 2011 Tr. 56:25–62:21, 72:15–75:22]. The Debtor, Ms. Wise, Ms. Rocher, and Logsdon, however, swore that it was the Plaintiff who began verbally abusing the Debtor and initiating physical contact, and that the Debtor punched the Plaintiff only as a last resort. [March 18, 2011 Tr. 32:5–39:23, 40:16–41:6, 44:16–47:21, 105:15–18, 111:2–117:2]; [April 5, 2011 Tr. 15:2–18:9, 73:13–78:2].

3

Unfortunately, the other four witnesses who testified at trial did not see the altercation, and therefore could not provide this Court with an unbiased, third-party, eye-witness account of the events that transpired. The Court therefore must carefully weigh the credibility of the six witnesses who testified about what happened during the evening of December 5, and the early morning of December 6, 2009. The Court has closely reviewed the transcript of all of the testimony adduced at trial and has also carefully studied all of the exhibits introduced at trial. The Court has done its best to harmonize and reconcile the testimony about a very fact-intensive situation, but in some instances, the Court cannot do so. Accordingly, some of the findings of fact that this Court now makes necessarily means that the Court does not believe certain testimony given by various witnesses. In sum, these witnesses gave testimony that was credible on some points and not credible on other points.

With respect to the other four witnesses who testified, as noted already, none of them were physically present to observe the altercation between the Plaintiff and the Debtor. Dr. Irv Wishnow was called to testify as a character witness for the Plaintiff, but it was, for the most part, fairly generic testimony that does not greatly assist this Court in rendering this decision. Mark Stephenson did attend the holiday party where the altercation occurred, but he did not witness the hostilities at all, and therefore his testimony did not aid the Court in making its decision.[2] Edwin Godwin, an officer with the Houston Police Department, was not the responding officer who appeared on the scene. Rather, he only has knowledge of the altercation

---

[2] Mr. Stephenson was subpoenaed by the Plaintiff because he had told the private investigator hired by the Plaintiff that the Debtor had "sucker punched" the Plaintiff. [March 18, 2011 Tr. 135:4–15] However, sitting in the witness box, under oath, Mr. Stephenson admitted that he did not see the Debtor punch the Plaintiff, nor did he hear any verbal exchanges between these two individuals. [March 18, 2011 Tr. 132:17–25]. It is unclear why he told the Plaintiff's private investigator that he had seen the Debtor punch the Plaintiff. Probably the best that can be said of Mr. Stephenson's role at trial is that once he took the oath, he did not give false statements as he did to the private investigator when he was not under oath. Because this Court believes Mr. Stephenson's testimony under oath, this Court concludes that he did not witness the altercation between the Plaintiff and the Debtor. Accordingly, his testimony does not assist this Court in making its decision.

through his desk duty. Therefore, his testimony did not aid the Court. All in all, while these four witnesses were credible, their testimony does not significantly help this Court render its decision.

Officer Trung Le, the responding officer from the Houston Police Department, gave testimony that assisted this Court in issuing this ruling. Officer Le, although not present during the incident, did appear on the scene within a few minutes thereafter. At that time, he met and observed the Plaintiff, and met and took statements from the Debtor, Ms. Wise, Ms. Rocher, Logsdon, and the Plaintiff. His very credible testimony about the Plaintiff's behavior and condition at that time—particularly the Plaintiff's high state of intoxication—has assisted this Court in rendering its ruling.

## IV. FACTUAL BACKGROUND

### A. History of Bad Blood between the Plaintiff and the Debtor Leading Up to the Altercation between the Two in the Early Morning of December 6, 2009

1. The Plaintiff and Julia Wise (Ms. Wise) were married for several years. [March 18, 2011 Tr. 95:5–13].

2. The Plaintiff and Ms. Wise, while married, had two daughters. Both children are still minors. [March 18, 2011 Tr. 15:11–16, 95:13–14].

3. In August of 2007, during the course of her marriage, Ms. Wise began having an illicit relationship with the Debtor, who is a pilot for American Airlines. [March 18, 2011 Tr. 14:9–21, 46:1–6, 87:17–20, 100:6–9]. The Debtor is divorced [March 18, 2011 Tr. 30:18], and has one daughter who is seven years old. [Main Case Doc. No. 1, Schedule I].

4. Ms. Wise did not disclose this affair to the Plaintiff. [March 18, 2011 Tr. 118:7–16]. Indeed, she lied to her husband about having the affair with the Debtor. [March 18, 2011 Tr. 118:13–16].

5.      Eventually, the Plaintiff discovered that his wife was having an adulterous relationship with the Debtor. [March 18, 2011 Tr. 14:23–24].

6.      The Plaintiff and Ms. Wise thereafter began divorce proceedings, and the divorce became final in either June of 2009 or October of 2009. [March 18, 2011 Tr. 67:5–6, 108:11–12].

7.      Prior to the altercation, the Debtor sent text messages to the Plaintiff taunting him. Specifically, the Debtor's messages stated that he was much more capable than the Plaintiff at satisfying the sexual needs of the Plaintiff's wife. [March 18, 2011 Tr. 21:21–23:7, 64:17–22]. Aside from receiving such taunting text messages, the Plaintiff also suffered the indignity of knowing that the Debtor had moved in with his wife and two daughters. [March 18, 2011 Tr. 15:5–16].

8.      After the Debtor had begun his relationship with the Plaintiff's wife and subsequently sent the offending text messages to the Plaintiff, the cuckolded Plaintiff contacted the Federal Aviation Administration (FAA) and reported that the Debtor was using drugs. [March 18, 2011 Tr. 26:7–27:3]. This allegation prompted the FAA to investigate the Debtor to determine whether to suspend or terminate his pilot's license. [March 18, 2011 Tr. 26:14–30:23].[3] Although the Debtor did not definitively know that the Plaintiff had reported the Debtor to the FAA, the Debtor suspected that he did. [March 18, 2011 Tr. 30:12–23].

9.      The Plaintiff made his FAA complaint upon discovering a dresser drawer in Ms. Wise's bedroom that contained sex paraphernalia and drugs. [March 18, 2011 Tr. 54:19–24]. The Plaintiff had gone into Ms. Wise's home, ostensibly to pick up some personal belongings, with a private investigator. [March 18, 2011 Tr. 54:19–24].

---

[3] After its investigation, the FAA took no action with respect to the Debtor. [March 18, 2011 Tr. 28:21–29, 31:2–8].

While there, the investigator took photos in Ms. Wise's bedroom. These photos showed the drugs and sex paraphernalia. [March 18, 2011 Tr. 54:4–55:11, 63:21–64:16]. Not surprisingly, these actions created great animosity between the Plaintiff and the Debtor, as well as between the Plaintiff and Ms. Wise.

## B. The Events at the Party on the Evening of December 5, 2009 and the Early Morning Of December 6, 2009

10. On the evening of December 5, 2009, the Plaintiff went to a holiday party at the home of Lisa Rapier (Rapier). [March 18, 2011 Tr. 15:23–20:21, 108:13–109:7]; [April 5, 2011 Tr. 9:10–15]. Accompanying the Plaintiff was Noelle Pilegge (Ms. Pilegge), who at that point had been dating the Plaintiff for several months.[4] [March 18, 2011 Tr. 67:3–4].

11. Also attending this same party were Ms. Wise and the Debtor. [April 5, 2011 Tr. 9:10–15]. They had continued their relationship after Ms. Wise and the Plaintiff received their divorce. Of course, as already noted, the Debtor had moved in with Ms. Wise and her two daughters. [March 18, 2011 Tr. 15:5–16, 117:18–118:6].

12. The Debtor and Ms. Wise came to the party in the Debtor's truck with another couple: Vicky Rocher (Ms. Rocher) and Shaun Logsdon (Logsdon). [March 18, 2011 Tr. 16:10–17:14, 110:10–13]. Ms. Rocher is a friend of Ms. Wise, and Ms. Rocher was dating Logsdon at the time. [March 18, 2011 Tr. 16:13–17:14].

13. According to Ms. Rocher's testimony, the Debtor had to park his truck on a side street because "it was too crowded to park on the street where the party was." [April 5, 2011 Tr. 12:3–4]. Once the Debtor parked his truck, Ms. Rocher, Logsdon, Ms. Wise, and the Debtor walked to the party. [April 5, 2011 Tr. 12:12–14]. According to

---

[4] Ms. Pilegge began dating the Plaintiff after the divorce proceedings began but before the Family Law Court actually signing the divorce decree. [March 18, 2011 Tr. 67:3–6].

Ms. Rocher, they walked approximately one-quarter of a mile. [April 5, 2011 Tr. 12:15–16].[5]

14. There were more than two hundred guests at the party. Although, by 12:30 a.m. (now December 6, 2009), the attendance had thinned out to approximately fifty or sixty people. [March 18, 2011 Tr. 88:6–15].

15. During the time that the Plaintiff was at this party, he consumed substantial alcoholic beverages, and as the evening wore on, the Plaintiff became intoxicated. Meanwhile, the Debtor had a few drinks, but did not become intoxicated. [March 18, 2011 Tr. 18:3–15]; [April 5, 2011 Tr. 64:1–6]. Additionally, Ms. Wise, Ms. Rocher, and Logsdon also consumed alcoholic beverages, but none of them became inebriated. [April 5, 2011 Tr. 72:10–19].

16. At approximately 1:00 a.m., the incident that resulted in the filing of this lawsuit occurred. [March 18, 2011 Tr. 83:22–25, 110:7–9].

## C. The Punch that the Debtor Landed on the Plaintiff

17. The Debtor and Ms. Wise departed the party by going out the front door of the Rapier residence. [March 18, 2011 Tr. 32:5–13, 110:17–111:7] [April 5, 2011 Tr. 15:16–18, 74:5–12]. The Debtor was not intoxicated upon departing this party.[6]

---

[5] The Debtor seems to agree with Ms. Rocher insofar as he testified that "the truck was a very long way away." [March 18, 2011 Tr.42:7]. However, according to Logsdon, the truck was parked approximately one block away from the house where the party took place. [April 5, 2011 Tr. 71:19–22, 87:19–88:8]. Ms. Wise is more in accord with Logsdon than with the Debtor and Ms. Rocher because Ms. Wise testified that the Debtor's truck was parked two blocks away from the Rapier residence. [March 18, 2011 Tr. 124:5–7]. The testimony of Logsdon and Ms. Wise therefore differs from Ms. Rocher's and the Debtor's testimony on this particular point, although what is most important on this issue is that all of them agree that the truck was parked sufficiently far away from the party that they had to do more than simply walk a few steps to arrive at, and depart from, the party.

[6] Ms. Rocher, who observed the Debtor punch the Plaintiff, testified that the Debtor was not intoxicated. [April 5, 2011 Tr. 47:18–23]. Moreover, Logsdon also testified that when the Debtor left the party, he was not intoxicated. [April 5, 2010 Tr. 20:14–16]. Ms. Pilegge also testified that the Debtor was not intoxicated. [March 18, 2011 Tr. 66:16–17]. And, the Debtor himself testified that he was not intoxicated. [March 18, 2011 Tr. 18:6–8] The Court finds that the Debtor was not inebriated when he punched the Plaintiff.

18.     Meanwhile, the Plaintiff and Ms. Pilegge stood on each side of the door and started making unpleasant remarks to the Debtor and Ms. Wise as they departed the Rapier house and walked toward the end of the driveway. [March 18, 2011 Tr. 32:14–21]; [April 5, 2011 Tr. 16:7–13, 75:5–7]. The Plaintiff then went out the front door and started shouting obscenities, calling both the Debtor and Ms. Wise certain unsavory names. [March 18, 2011 Tr. 32:18–33:4, 111:8–20]; [April 5, 2011 Tr. 77:10–14].

19.     At this point, Ms. Rocher and Logsdon went through the front door. Neither Ms. Rocher nor Logsdon were intoxicated upon leaving the party. [March 18, 2011 Tr. 127:2–8]; [April 5, 2011 Tr. 94:5–6]. Subsequently, Ms. Rocher, hearing the Plaintiff yelling at the Debtor, placed herself in front of the Plaintiff and attempted to calm him down.[7] [April 5, 2011 Tr. 16:1–21, 74:5–10, 99:14–24].

20.     By this time, the Debtor and Ms. Wise had walked to the end of the driveway. [March 18, 2011 Tr. 112:14–113:6]; [April 5, 2011 Tr. 43:5–9, 75:24–76:6, 97:6–23]. Both Ms. Rocher and Logsdon testified that the Debtor and Ms. Wise were approximately fifty feet away from the Plaintiff. [April 5, 2011 Tr. 36:17–25, 37:11–13, 43:5–9, 98:17–23, 108:20–22], and a photograph of the Rapier residence (which shows the front yard and driveway) indicates that their estimate is quite plausible. [Ex. No. 1].[8] The Court finds that the distance between where the Plaintiff was yelling at the Debtor and Ms. Wise, and where the Debtor and Ms. Wise were standing at the end of the driveway, is approximately fifty feet.

---

[7] Ms. Rocher knew the Plaintiff because she became "very good friends" with Ms. Wise during the time that the Plaintiff and Ms. Wise were married. [April 5, 2011 Tr. 22:5–23:15]. Indeed, Ms. Rocher testified that she was also a friend of the Plaintiff. [April 5, 2011 Tr 23:14 ].

[8] All references herein to "exhibits" are to Plaintiff's exhibits, unless express reference is made to "Defendant's Exhibit."

21.    At the time that Ms. Rocher jumped in front of the Plaintiff to calm him down, the Plaintiff was shouting at the Debtor and Ms. Wise; he was very intoxicated; he was slurring his speech; he could barely stand; and he was staggering.[9] [March 18, 2011 Tr. 116:3–17; April 5, 2011 Tr. 46:9–15].

22.    The Plaintiff, with his palms open, shoved Ms. Rocher away by pushing her on her shoulders. According to Ms. Rocher, however, the Plaintiff neither hit her nor hurt her. [April 5, 2011 Tr. 38:1–11, 40:1–14]. Upon observing the Plaintiff shove Ms. Rocher, Logsdon took off his jacket and placed himself in front of the Plaintiff in an effort to come to Ms. Rocher's defense. [April 5, 2011, Tr. 100:4–23, 110:8–10]. Once Logsdon did so, the Plaintiff, with his palms open, shoved him by pushing him on his shoulders. [April 5, 2011 Tr. 75:17–23, 102:22–103:5]. However, Logsdon admitted that the Plaintiff neither hit him nor hurt him. [April 5, 2011 Tr. 103:1–24]. Further, Ms. Rocher admitted that the Plaintiff, after first shoving her and then shoving Logsdon, did not step aggressively toward either of them. [April 5, 2011 Tr. 43:23–44:3]. Ms. Rocher also admitted that the Plaintiff did not move aggressively towards the Debtor. [April 5, 2011 Tr. 44:4–6].

---

[9] There was conflicting testimony about whether the Plaintiff was intoxicated. The Plaintiff and his girlfriend, Ms. Pilegge, contend that the Plaintiff was not intoxicated. [March 18, 2011 Tr. 66:14–15]. Conversely, the Debtor, Ms. Wise, Ms. Rocher, and Logsdon all testified that the Plaintiff was in fact inebriated; indeed, there was some testimony that the Plaintiff was very drunk. [March 18, 2011 Tr. 25:21–22, 116:8–17]; [April 5, 2011 Tr. 13:9–14, 46:9–15, 77:10–17]. The Court, having listened and observed the witnesses, finds that the Plaintiff was intoxicated.

It is worth noting that approximately thirty minutes later, when Houston Police Officer Trung Le arrived at the Rapier house, he found the Plaintiff to be very intoxicated. [April 20, 2011 Tr. 14:14–17]. According to Officer Le, the Plaintiff was slurring his speech, smelled heavily of alcohol, and was stumbling while walking, so much to the point that Officer Le had to assist him in walking. [April 20, 2011 Tr. 19:20–20:7, 43:11–22, 49:1–9]. Officer Le observed the Plaintiff **after** he received his concussion from the punch thrown by the Debtor. However, given the credible testimony about the Plaintiff's high degree of intoxication **before** the Debtor punched him, the Court finds that the Plaintiff was very intoxicated at the moment he went through the front door of the Rapier residence and started shouting at the Debtor.

23.     After watching the Plaintiff push Ms. Rocher and Logsdon, the Debtor returned up the driveway toward the Plaintiff, who was approximately fifty feet away. [April 5, 2011 Tr. 43:5–22, 44:7–11, 106:2–4]. Once the Debtor was within a few feet of the Plaintiff, the Plaintiff shoved him a few times while making unpleasant remarks, such as "Hey, you big pussy. What's the matter? Come down here. I want to talk to you. What are you going to do about it, pussy?" [March 18, 2011 Tr. 115:9–11; April 5, 2011 Tr. 16:15–17, 44:24–45:1, 104:14–19]. According to Logsdon, who had backed away after being shoved aside by the Plaintiff and was now observing the Plaintiff and the Debtor, the Plaintiff pushed the Debtor by shoving the Debtor's shoulders. [April 5, 2011 Tr. 105:18–24]. Further, according to Logsdon, the Plaintiff never tried to hit the Debtor. [April 5, 2011 Tr. 106:5–6]. The Court therefore finds that the Plaintiff never attempted to hit the Debtor. Moreover, the Court finds that the Plaintiff was not brandishing any gun or other weapon. Indeed, the Debtor conceded that the Plaintiff never gave any indication of having a weapon, and Ms. Rocher confirmed as such. [March 18, 2011 Tr. 36:8–10]; [April 5, 2011 Tr. 42:22–43:4].

24.     It was at this point that the Debtor punched the Plaintiff in the mouth. [March 18, 2011 Tr. 38:19–39:2]. The Debtor admitted that he intended to punch the Plaintiff. [March 18, 2011 Tr. 41:3–15]; [Adv. Doc. No. 79, p.2, ¶ V]. Given that the Debtor was not inebriated and that the Plaintiff was extremely intoxicated, slurring his speech, barely able to stand, and staggering, the Court finds that the Plaintiff could not possibly have defended himself against the punch thrown by the Debtor.[10]

---

[10] Ms. Rocher's testimony, on cross examination, bears out this Court's conclusion:

25.     The impact of the punch knocked out the Plaintiff, who, in a completely unconscious state, then fell, hitting his head on the ground. [March 18, 2011 Tr. 40:16–19, 62:7–21, 75:9–19, 124:8–125:13].

26.     The Debtor threw his punch with such force that after the Debtor struck the Plaintiff, the Debtor himself fell to the ground. [March 18, 2011 Tr. 40:16–19, 124:8–125:13]; [April 5, 2011 Tr. 47:8–14, 106:14–15].

27.     The Debtor's punch was so forceful that the Debtor himself injured his hand, which had to be bandaged up. [March 18, 2011 Tr. 39:18–20, 106:11–22].

28.     The Plaintiff is approximately 6'5", whereas the Debtor is approximately 5'8." [March 18, 2011 Tr. 47:10–20]. The Plaintiff is a very slender individual, whereas the Debtor is somewhat stocky and very athletic. Indeed, the Debtor testified that he is in good physical shape and was not suffering from any physical ailments at the time of the altercation with the Plaintiff. [March 18, 2011 Tr. 36:20–37:2].

**D. Immediate Post-Altercation Events**

29.     After the Debtor knocked out the Plaintiff, the Debtor and his three companions (*i.e.*, Ms. Wise, Ms. Rocher, and Logsdon) decided not to depart the party after all; rather, they stayed on the premises while the Debtor called the Houston Police Department. [March 18, 2011 Tr. 127:17–128:16].

30.     After the altercation, Houston Police Officer Trung Le and his backup arrived at the Rapier residence. [April 20, 2011 Tr. 18:21–19:13]. Officer Le took statements from

---

Q: Do you have an explanation, Miss Rocher, how [the Debtor] was able to get a man much taller than he is standing that close to him without [the Plaintiff] putting up any defensive moves at all, trying to block the blow, or duck the blow, or turn away from—

A: He [the Plaintiff] was extremely intoxicated, sir. He could barely stand. He was staggering.

[April 5, 2011 Tr. 46:9–15].

the Plaintiff, the Debtor, Ms. Wise, Ms. Rocher and Logsdon. [April 20, 2011 Tr. 16:2–6, 30:16–18]; [Defendant's Ex. No. 1]. After taking these statements and assessing the situation, Officer Le decided to make no arrests. [March 18, 2011 Tr. 69:4–7, 69:21–22]; [Defendant's Ex. No. 1].

31.   After the Debtor, Ms. Wise, Ms. Rocher, and Logsdon gave their statements, they departed. [April 20, 2011 Tr. 5–9].

32.   Meanwhile, an ambulance had been called. [March 18, 2011 Tr. 62:22–63:4]. The three-page report of the Houston Fire Department—which provided the EMS ambulance—reflects the following: (1) a telephone call came in to EMS at 1:38 a.m. on December 6, 2009; (2) the ambulance departed at 1:38 a.m.; (3) it arrived at the Rapier home at 1:43 a.m.; (4) the two EMS employees in the ambulance started administering aid to the Plaintiff at 1:44 a.m; and (5) the ambulance departed the Rapier home (with the Plaintiff on board) and arrived at Memorial City Hospital at 2:13 a.m. [Ex. 10, p. 35].

33.   The EMS ambulance then arrived at the Memorial City Hospital, the Plaintiff checked in and was admitted at 2:16 a.m. [Ex. No. 10, p. 24].

34.   Dr. Robert Szema thereafter examined the Plaintiff and stitched up the Plaintiff's lip. [Ex. No. 10, p. 25]. Additionally, based upon his examination and conference with the Plaintiff, Dr. Szema decided to order a CAT scan of the Plaintiff's brain and spine. [Ex. No. 10, p. 25]. These tests were done shortly thereafter, and both reflected no abnormalities. [Ex. No. 10, p. 27–28]. Nevertheless, Dr. Szema's diagnosis reflects that the Plaintiff suffered harm from the punch that he took from the Debtor and the subsequent fall to the ground. Dr. Szema concluded that the Plaintiff suffered

13

a "Concussion with LOC, Laceration Lip."[11] [Ex. No. 10, p. 29]. A prescription for

Augmentin (875 mg) was given to the Plaintiff. *Id.* The hospital then discharged the

Plaintiff at 5:07 a.m. [Ex. No. 10, p. 25].

35.     On December 7, 2009, the Plaintiff had a photograph taken of his face. This

photograph shows the extensive damage to the Plaintiff's left lower lip that the

Debtor's punch caused. [Ex. No. 2].

**E. Medical Visits Made by the Plaintiff to Treat the Physical and Psychological Injuries Resulting from the Debtor's Punch**

36.     Since the Plaintiff departed Memorial City Hospital on the morning of December 6,

2009, he has seen several doctors with various areas of expertise to obtain treatment

for the injuries that he suffered due to the Debtor's punch.

37.     On December 7, 2009, the Plaintiff visited Dr. Larry Likover, who is an orthopedic

surgeon in Houston, Texas. The purpose of this consultation was to determine the

extent of the injury to the Plaintiff's ribs. In completing his questionnaire at Dr.

Likover's office, the Plaintiff set forth that his chief complaint was "deep rib pain

along back, left side." [Ex. No. 5, p. 11]. He then described his pain as follows: "can

lie on either side, tremendous pain when I cough, mild when I breathe deep. Sudden

movements cause jarring stabbing pain." [Ex. No. 5, p. 13]. According to the

Plaintiff, Dr. Likover told him that the pain he was experiencing "was from the

impact of falling that the rib cartilage had torn on my left side of the ribs where it

joins, you know, the back." [March 18, 2011 Tr. 78:13–15]. Indeed, Dr. Likover's

notes of his examination of the Plaintiff reflect the diagnosis that he reached and the

plan he devised for the Plaintiff. His diagnosis was: "Severe bruising, contusion to his

---

[11] LOC means "Loss Of Consciousness."

left rib cage." [Ex. No. 5, p. 15]. The plan he devised was as follows: "Unfortunately, time is what is needed. It is very likely that this will take 8 to 12 weeks for healing. I have offered him pain medication. This is a very painful injury. He was seen in the emergency department following this incident and had a head CAT scan that was okay as far as we know. If he does not get better, he will need to return to see us. There is nothing surgical that needs to be done at this time. If he does not start feeling better in the next couple of weeks, he needs to return to see us and a possible MRI will be ordered at that time." [Ex. No. 5, p. 15].[12]

38.   One week later, on December 14, 2009, the Plaintiff visited Dr. Mark Schroeder, DDS, who is a dentist in Houston, Texas. The purpose of the consultation concerned the Plaintiff's jaw pain. However, none of the Plaintiff's exhibits reflects any diagnosis made by Dr. Schroeder or the plan that he devised for the Plaintiff. Exhibit No. 8, though, clearly reflects that Dr. Schroeder charged the Plaintiff for x-rays and a visit on December 14, 2009. Moreover, according to the Plaintiff, "for many months beyond that, I had to go see a dentist to get my jaw checked because of soreness in the temples." [March 18, 2011 Tr. 76:8–12].

39.   On April 19, 2010, the Plaintiff met with Dr. Paul Fortes, who is a plastic surgeon in Houston, Texas. The purpose of this consultation was to discuss whether Dr. Fortes could perform surgery on the Plaintiff's lower lip to remove scar tissue from the laceration. Dr. Fortes' notes from his examination of the Plaintiff are as follows: "Thick scar of the left lower lip vermillion . . . It causes difficulty with speech and normal movements of the lips." [Ex. No. 6, p. 7]. Dr. Fortes recommended a series of

---

[12] In fact, the Plaintiff did recover and start feeling better, but it took at least a couple months longer than Dr. Likover had estimated. [March 18, 2011 Tr. 78:13–21].

Kenalog injections,[13] a course of action the Plaintiff accepted and has heretofore pursued. The medical records of Dr. Fortes reflect that the Plaintiff has undergone these injections on April 19, 2010, June 24, 2010, July 29, 2010, October 21, 2010 and December 9, 2010. [Ex. No. 6, p. 7]. According to Dr Fortes' notes from the October 21, 2010 visit that the Plaintiff made to his office, the injections of Kenalog have alleviated the damage to some extent, but not entirely: "lower lip traumatic scar—seems to be getting softer, but not fully corrected will continue to treat." [Ex. No. 6, p. 10].

40.  On September 8, 2010, the Plaintiff met with Dr. Summer D. Ott, who is a neuropsychologist in Houston, Texas. The purpose of this consultation was to discuss the Plaintiff's continuing headaches and concerns with his loss of memory and fatigue. Dr. Ott's diagnosis was as follows: "It is my impression that the patient continues to demonstrate the effects of the concussion sustained in December 2009. Although the patient has perceived improvement over the past several months, lingering post-concussive difficulties remain, particularly with speed and on information processing. The patient also continues to experience some lingering headaches as a result of his concussive injury." [Ex. No. 7]. Overall, Dr. Ott's notes indicate that the Plaintiff has not fully recovered from the blow that he took to the head due to the Debtor's punch and the resulting hitting of his head on the driveway pavement while falling.

41.  As of the first day of the trial (*i.e.*, March 18, 2011), the Plaintiff was still suffering the effects of the Debtor's punch. First, the Plaintiff is still seeing Dr. Fortes, who is doing lip injections to attempt to reduce the scar tissue in the Plaintiff's mouth.

---

[13] Kenalog is a long-acting corticosteroid. It has an anti-inflammatory effect.

[March 18, 2011 Tr. 77:20–25]. Second, although the Plaintiff has recovered significantly from the effects of the concussion that he sustained, the Plaintiff continues to experience fatigue, memory loss, lack of concentration, and headaches. [March 18, 2011 Tr. 79:8–80:4].[14]

42.     The total charges of the ambulance transport and all of the Debtor's medical visits and tests ordered by his doctors since the punch that the Debtor landed on him is $20,587.75. [Ex. No. 3]. Of this total amount, the Plaintiff himself paid $3,065.71; his insurance carrier paid $4,411.39; and the remaining amount of approximately $13,000.00 constituted adjustments.[15] Thus, the total amount of medical expenses actually paid is $7,477.10. This total does not include costs that the Plaintiff will continue to incur for medical treatment from the date of trial going forward; there was no testimony adduced or exhibits introduced on this issue.

43.     The Plaintiff seeks actual damages of $20,587.75 (representing the total charges relating to his medical visits and tests) and punitive damages of $50,000.00.

## V. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§

---

[14] The Plaintiff testified that his ribs and jaw have healed. [March 18, 2011 Tr. 89:1

[15] Plaintiff's Ex. 3 is a chart showing the total charges, the amount paid by the Plaintiff's insurance carrier, the adjustments, and the amount paid by the Plaintiff. The Court construes the column entitled "Adjustments" to mean that the Plaintiff's insurance carrier conducted negotiations with the Plaintiff's medical providers and was able to write-off the amounts set forth in the "Adjustments" column. TEX. CIV. PRAC. & REM. CODE § 41.0105 (Vernon 2010) ("[R]ecovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the claimant."); see also Mills v. Fletcher, 229 S.W.3d 765, 769 (Tex. App.—San Antonio 2007, no pet.) ("We, therefore, hold that section 41.0105 limits a plaintiff from recovering medical or health care expenses that have been adjusted or 'written off.'"); Coppedge v. K.B.I., Inc., No. 9:05-CV-162, 2007 U.S. Dist. LEXIS 48407, at *8 (E.D. Tex. July 3, 2007) (indicating that Section 41.0105 allows for the post-verdict reduction of plaintiff's recovery for past medical expenses for amounts "written off" or "adjusted).

157(b)(2)(A), (B), (I), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See*

*Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir.

1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by

title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy

case."); *De Montaigu v. Ginther (In re Ginther Trusts)* Adv. No. 06-3556, 2006 WL 3805670, at

*19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core

proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under §

157(b)(2) does not specifically name this particular circumstance"). Venue is proper pursuant to

28 U.S.C. § 1409.

**B. The Legal Issues to Decide in this Adversary Proceeding: How Much of a Debt does the
Debtor Owe to the Plaintiff, and is this Debt Nondischargeable?**

The Debtor has stipulated that he owes a debt to the Plaintiff;[16] however, the Debtor and

the Plaintiff disagree on the amount that is owed. The Debtor contends that he owes $100.00 to

the Plaintiff. [Schedule F, Main Case Doc No. 1]. The Plaintiff contends that the Debtor owes

him the amount of $20,587.75, which are the total charges for the Plaintiff's medical bills.

[Finding of Fact No. 42]. Additionally, the Plaintiff contends that the Debtor should be liable for

punitive damages of $50,000.00 [Finding of Fact No. 43]. This Court must therefore first

determine the total amount of the debt that the Debtor owes to the Plaintiff. This determination

must be made pursuant to applicable Texas law. Then, once the total amount of debt is

---

[16] In the Joint Pre-Trial Statement, signed by both counsel for the Plaintiff and the Debtor, in Section V., entitled "ADMISSIONS OF FACT," the following admission is made: "The parties agree that Plaintiff is a creditor of Defendant [*i.e.*, Debtor]. . . ." [Adv. Doc. No. 79, p. 2, ¶ V].

The Court notes that counsel for both parties had in fact exchanged proposed findings of fact and conclusions of law prior to trial, and they had also given the Court a signed copy of this pleading. Counsel had also given the Court a signed Joint Pre-Trial Statement. However, after trial, the Court discovered that none of these pleadings had been entered on the docket. Accordingly, the Court held a hearing on May 17, 2011, and a record was made to confirm that the parties had attempted to file the pleadings prior to trial but without success. These same pleadings have since been filed and are shown the adversary docket sheet as document number 79.

established, the Court must determine whether this debt is nondischargeable under § 523(a)(6) of the Code.[17]

## C. Assault under Texas Law

1.     <u>The Debtor Committed Assault, and is Therefore Liable for any Damages Suffered by the Plaintiff</u>

Pursuant to the Texas Penal Code, the common law actions of assault and battery are addressed collectively as assault. TEX. PENAL CODE ANN. § 22.01(a)(Vernon 2010). Because the elements for assault are the same in both civil and criminal cases, assault occurs when a person "intentionally, knowingly, or recklessly causes bodily injury to another. . . ." TEX. PENAL CODE § 22.01(a)(1) (Vernon 2010); *Baribeau v. Gustafson*, 107 S.W.3d 52, 60–61 (Tex. App.—San Antonio 2003, pet. denied) (citing *Wal-Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 523 (Tex. App.—San Antonio 1996, writ denied)). In this suit, it is undisputed that the Debtor both intentionally and knowingly punched the Plaintiff [Finding of Fact No. 24], and that the Plaintiff suffered injury to his body due to the punch. [Finding of Fact Nos. 25, 34–41]. Accordingly, the Court concludes that the Debtor assaulted the Plaintiff, and that the Debtor is liable to the Plaintiff for any damages suffered by the Plaintiff, unless the Debtor has a meritorious affirmative defense. The Debtor has pleaded two affirmative defenses: (1) self defense; and (2) defense of third parties. The Court now discusses both of these affirmative defenses.

2.     <u>The Affirmative Defenses of "Self Defense" and "Defense of Third Party" do not Relieve the Debtor of his Liability for Damages.</u>

Because it is undisputed that the Debtor both intentionally and knowingly punched the Plaintiff, the Court must now determine whether the Debtor's actions come within the doctrine of self-defense. Similar to assault and battery, "the law of self-defense is the same in both civil

---

[17] Simply because a debt is liquidated does not automatically mean it is nondischargeable; a § 523 analysis must still be done.

and criminal cases." TEX. PENAL CODE ANN. § 9.31(a) (Vernon 2010). This rule is the same whether one is defending himself or defending another person. *Rhoden v. Booth*, 344 S.W.2d 481, 485 (Tex. Civ. App.—Dallas, 1961, writ ref'd n.r.e.). "Self-defense is justified when a person 'reasonably believes' that 'force is immediately necessary to protect himself against the other's use or attempted use of unlawful force.'" *Curry v. State*, 222 S.W.3d 745, 749 (Tex. App.—Waco 2007, pet. ref'd) (citing TEX. PENAL CODE ANN. § 931(a) (Vernon 2010)); *see also Schoenfeld v. State*, No. 05-03-01447-CR, 2004 WL 2802511, at *3 (Tex. App.—Dallas Nov. 30, 2004, pet ref'd) (holding that a jury was proper in rationally rejecting a husband's self-defense claim as he could not reasonably have believed that hitting his wife was necessary to protect himself against his wife's use or attempted use of force). When no deadly force justification applies,[18] the defendant asserting self-defense must attempt to retreat. *Hill v. State*, No. 03-09-00213-CR, 2010 WL 2540603, at *4 (Tex. App.—Austin June 25, 2010, no pet.).

This Court finds *Fegans v. State* instructive. No. 05-99-01423-CR, 2001 Tex. App. LEXIS 3413, at *6 (Tex. App.—Dallas May 24, 2001 no pet.). In that case, the evidence was sufficient to defeat a defendant's self-defense claim because that particular defendant made no attempt to escape from the complainant and made no other attempt to protect himself aside from swinging a razor blade at the complainant. *Id.* at *6, 12. The facts here are similar. The Debtor had ample opportunity to avoid the hostile situation, but instead chose to further escalate it by walking toward the Plaintiff. [Finding of Fact No. 23]. The Debtor and Ms. Wise were at the end of the driveway when the Plaintiff was just outside the front door. [Finding of Fact Nos. 18, 20 & 21]. The Plaintiff first pushed Ms. Rocher, and then he shoved Logsdon. [Finding of Fact No. 22]. But, that was all the Plaintiff did. He was not brandishing a gun or other weapon, [Finding

---

[18] Deadly force is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." TEX. PENAL CODE ANN. § 9.01(3) (Vernon 2010).

of Fact No. 23], so the Plaintiff was not on the verge of using deadly force. At this point, the Plaintiff was not in close physical proximity to the Debtor—he was approximately fifty feet away. [Finding of Fact Nos. 20 & 23]. The Debtor could therefore have continued walking with Ms. Wise to his truck instead of leaving Ms. Wise at the end of the driveway, turning around, and proceeding back up the driveway to confront the Plaintiff. [Finding of Fact No. 23]. Stated differently, the Debtor could have easily escaped the Plaintiff by simply walking briskly down the block with Ms. Wise and getting into his truck. The existence of this escape route bars the affirmative defense of self-defense.

To the extent that the Debtor was fearful about Ms. Rocher's safety, Logsdon had already taken off his jacket and prepared himself to protect her from the Plaintiff. [Finding of Fact No. 22]. Given that the Plaintiff was extremely intoxicated to the point of slurring his speech, [Finding of Fact No. 21], his ability to do anything more than shove someone was greatly impaired.[19] Accordingly, the Court finds that there was no need for the Debtor to turn around and walk back up the driveway approximately fifty feet to confront the Plaintiff.

Even assuming that the Debtor was justified in approaching the Plaintiff, it would have been a relatively simple matter for the Debtor and his friends to escape the Plaintiff. As already noted, the Plaintiff was so inebriated that he was staggering and slurring his speech. [Finding of Fact No. 21]. The Debtor could have requested Ms. Rocher and Logsdon to quickly walk away from the Plaintiff and join Ms. Wise, who was at the end of the driveway, while the Debtor walked back up the driveway to converse with the Plaintiff. The Debtor could have kept the Plaintiff's attention while Ms. Rocher and Logsdon quickly walked down the driveway—and

---

[19] While this Court notes that some people are prone to be more violent when drunk, the Court finds that the Plaintiff was so inebriated that physically, it would have been nearly impossible for him to inflict serious harm on anyone. About the only action he was capable of taking was to push someone back when they got in front of him.

then the Debtor himself could have quickly walked away from the Plaintiff, joined his companions at the end of the driveway, and then quickly walked toward the Debtor's truck, which was at least a block away—a distance that the Plaintiff would have had great difficulty negotiating given his extremely drunken state. [Finding of Fact Nos. 13 & 21]. In sum, given the Plaintiff's intoxicated state, he would have had much difficulty catching up with the Debtor, Ms. Wise, Logsdon, and Ms. Rocher if they had quickly walked to the Debtor's truck. Of course, he would have had even greater difficulty inflicting any bodily harm on them even if he had caught up with them. This opportunity to escape leads this Court to conclude that the Debtor could not have reasonably believed that force was immediately necessary to protect himself against the Plaintiff. The Debtor's actions were not justified under the circumstances.

Even if the Debtor could not have escaped from the Plaintiff, this Court concludes that a reasonable person would not have used the degree of force that the Debtor used. *See Curry*, 222 S.W.3d at 749. The degree of force with which a person responds to an actual or apparent threat must be proportional to the degree of force that he faces. *Evans v. State*, 2010 WL 376940, at *2 (Tex. App.—Waco Feb. 3, 2010, pet. ref'd) (citing *Tidmore v. State*, 976 S.W.2d 724, 728–29 (Tex. App.—Tyler 1998, pet. ref'd)). A response that exceeds the scope of the original attack may be a factor that precludes a party from relying on self-defense. *See Kleman v. Taylor* (*In re Taylor*), 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004). Moreover, conduct that is retaliatory rather than defensive is considered to be disproportionate. *See Zuliani v. State*, 2003 WL 21023105, at *4 (Tex. App.—Austin 2003, no pet.).[20]

---

[20] In *Zuliani*, a wife pushed her husband and he fell "on his butt," and in response, the husband pushed her so hard that she fell and hit her head on the bookshelf, causing a cut on her scalp. *Id.* at *1. The court held that the husband's conduct was retaliatory rather than defensive because his wife, who had recently undergone surgery for thyroid cancer, was not a threat to him. *Id.* at *4.

Here, the Plaintiff had only shoved the Debtor. [Finding of Fact No. 23]. The Plaintiff had thrown no punches, was brandishing no weapon, was very intoxicated, was staggering, and was slurring his speech. [Finding of Fact Nos. 21–23]. Meanwhile, the Debtor was sober. [Finding of Fact No. 15]. This Court concludes that punching the Plaintiff squarely in the mouth with such force that he lost consciousness was not proportional to the degree of force that the Debtor faced. Stated differently, the Debtor's punch was not a reasonable response, and this unreasonable degree of force vitiates the Debtor's defense of self-defense. Rather than punch the Plaintiff in the mouth, the Debtor could have: (a) shoved the Plaintiff out of the way; (b) gone back into the Rapier house and requested that some of the remaining guests to come outside and help calm down the Plaintiff; and (c) called the Houston Police Department. Or, the Debtor could have shoved the Plaintiff and then quickly retreated with his companions down the street to his truck. Instead, the Debtor clenched his fist as tight as he could, cocked his arm, and punched the Plaintiff in the mouth with tremendous force. [Finding of Fact Nos. 24–26]. Indeed, the Debtor swung his arm so hard to hit the Plaintiff that even he (*i.e.*, the Debtor) fell down, and thereafter had to have his hand bandaged due to the impact of his punch. [Finding of Fact No. 27]. In sum, the Debtor, who was not inebriated, chose to do a full-frontal attack on an individual who, by the Debtor's own testimony, was terribly drunk.[21] The affirmative defense of self-defense will not stand under these circumstances.

Additionally, the Debtor also argues that he punched the Plaintiff because he feared for the safety of third parties—namely, Ms. Wise, Ms. Rocher, and Logsdon. The affirmative defense "Defense of Third Person" applies if:

> (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably

---

[21] The Debtor himself testified at trial that the Plaintiff was intoxicated. [March 18, 2011 Tr. 25:21–26:2].

believes to be threatening the third person he seeks to protect; and (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

TEX. PENAL CODE § 9.33 (Vernon 2010). Under this provision, the actor "steps into the shoes of the third person" and exercises force on behalf of that person. *Hughes v. State*, 719 S.W.2d 560, 564 (Tex. Crim. App. 1986). Once the immediacy of an attack or alleged danger to the third party has lapsed, the actor is no longer justified in using force or deadly force to protect a third party. *Morgan v. State*, 545 S.W.2d 811, 814 (Tex. Crim. App. 1977).

The Court rejects the Debtor's argument that he punched the Plaintiff in order to protect Ms. Wise, Ms. Rocher, and Logsdon because this Court does not view the Debtor as having a reasonable belief that his intervention was immediately necessary to protect his companions. First, Ms. Wise was not in close proximity to the Plaintiff; she was at the end of the driveway—approximately fifty feet away the Plaintiff. [Finding of Fact No. 20]. Unlike the Plaintiff, she was sober and could have easily walked away toward the Debtor's truck. [Finding of Fact No. 15]. Therefore, as the Plaintiff failed to make any attack on or threat toward Ms. Wise, and because she was not in close proximity to the Plaintiff, the Debtor could not have reasonably believed an attack on her by the Plaintiff was imminent.

Second, although the Plaintiff had pushed Ms. Rocher, Logsdon had jumped in front of him to prevent the Plaintiff from taking any further action toward her. [Finding of Fact No. 22]. And, when the Plaintiff thereafter shoved Logsdon, Logsdon then took off his jacket and prepared to fend off the Plaintiff should he attempt to take any further action against her—which he did not. [Finding of Fact No. 22]. So, there was no question that Logsdon was prepared to take on the Plaintiff if that had become necessary. But, at this point, the Plaintiff took no further action, and both Logsdon and Ms. Rocher simply stood aside. [Finding of Fact Nos. 22 & 23]. If

they had wanted to quickly move or walk away from the Plaintiff—going either down the street toward the Debtor's truck or back into the Rapier residence to request assistance—they could have done so, as they were both sober, whereas, by their own testimony, the Plaintiff was extremely inebriated and could therefore not possibly have caught up with them. The fact that the only action that the Plaintiff took towards them was to shove them away, combined with their opportunity to escape the Plaintiff had they so chosen, leads this Court to conclude that the Debtor could not reasonably have believed that force was immediately necessary to protect Ms. Rocher and Logsdon.

In sum, the Debtor assaulted the Plaintiff, and the Debtor's affirmative defenses will not stand. Therefore, the Debtor is liable for damages to the Plaintiff. The Court now addresses the extent of these damages.

3.    Damages

      *i.*    *Compensatory Damages*

The total charges for the ambulance transport and all of the Plaintiff's medical visits and tests ordered by his doctors resulting from the Debtor's punch are $20,587.75. [Finding of Fact No. 42]. The Debtor has paid a portion of this total amount; his insurance carrier has paid a portion, and the remainder has been written off. [Finding of Fact No. 42]. Pursuant to the one satisfaction rule, a plaintiff may only have one recovery for a loss. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303–04 (Tex. 2006). However, the collateral source rule acts as an exception to the one satisfaction rule. *Bejjani v. TRC Servs.*, No. 14-08-00750-CV, 2009 Tex. App. LEXIS 8901, at *15 (Tex. App.—Houston [14th Dist.], Nov. 19, 2009, no pet.) (citing *Brown v. Am. Transfer and Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980). The collateral source rule sets forth that a tortfeasor may not benefit from insurance payments independently obtained

by the injured party when the wrongdoer is not in privity to that insurance contract. *Id.* Moreover, the right to an offset because of insurance proceeds is an affirmative defense. *Brown*, 601 S.W.2d at 936. As such, a party asserting this affirmative defense has the burden of pleading offset and factually supporting it. *Id.*, *Bejjani*, 2009 Tex. App. LEXIS 8901, at *15–16.

Here, the Debtor neither pled offset nor introduced any evidence that he was in privity of contract with the Plaintiff's insurance provider. As such, the one satisfaction rule does not apply and no compensatory damages are offset for amounts paid by the Plaintiff's insurance carrier.

While the Plaintiff's total medical charges amount to $20,587.75, the Plaintiff and the Plaintiff's insurance company paid significantly less than this amount, thus affecting the total amount of the Debtor's liability. [Finding of Fact No. 42]. This fact is explained by the adjustments (*i.e.*, write-offs) that the Plaintiff's insurance company made when paying the Plaintiff's claims. For example, Plaintiff's Exhibit 3 reflects that the total charges for the services rendered by Dr. Robert Szema in the early morning of December 6, 2009 at Memorial Herman Hospital were $8,064.75. This figure reflects the charges for, among other things, a CAT scan of the Plaintiff's brain and spine. [Finding of Fact No. 34]. Yet, Plaintiff's Exhibit 3 reflects that the Plaintiff paid only $244.00 of this charge, and his insurance carrier paid only $1,296.00 of this amount; the remaining $6,524.75 was written off.

Recent Texas case law reflects that amounts written off are not to be included in a compensatory damage award. Indeed, the watershed case of *Mills v. Fletcher* held that "section 41.0105 [of the Texas Civil Practice and Remedies Code] limits a plaintiff from recovering medical care expenses that have been adjusted or 'written off.'" 229 S.W.3d at 769.[22] That court

---

[22] The dissenting opinion in *Mills* notes that, among other things, "insult is added to injury when the injured party pays premiums for medical insurance coverage and then watches the benefits of that coverage lower the accountability of the tortfeasor for her negligent conduct." *Id.* at 772.

came to this conclusion by analyzing the plain meaning of section 41.0105 and conducting a statutory interpretation analysis of section 41.10105. *Id.*

Indeed, this decision was adopted in a 2007 memorandum opinion by the Honorable John D. Rainey, United States District Judge for the Southern District of Texas. In *Goryews v. Murphy Exploration & Prod. Co.*, Judge Rainey concluded that the holding in *Mills* "is a reasonable interpretation of the statute and will follow the intermediate court's decision in this regard." No. V-06-01, 2007 U.S. Dist. LEXIS 57719, at *11 (S.D. Tex. Aug. 8, 2007). Judge Rainey then goes on to explain his holding by noting "the equally important tort policy that tort damages are designed to make the victim whole" and because the insurance carrier "was only obligated to pay the reduced amount, it would undermine the 'make-whole' tort principle to allow the Plaintiff to receive medical expenses above and beyond those which he or his carrier were actually obligated to pay." *Id.* at *12 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 16 (Tex. 1994)).

This ruling stands in contrast to the holding in *Self v. Wal-Mart Stores, Inc.*, No. 2:05-CV-301, 2007 U.S. Dist. LEXIS 49662. Decided before *Mills*, Magistrate Judge John D. Love concluded that the definition of "actually incurred" (from section 41.10105) is the amount charged for the services, not the amount actually paid by the plaintiff and the insurance carrier. *Id.* at *4–5. In reaching his conclusion, Judge Love cited the Texas Supreme Court case which held that the term "actually incurred" includes all hospital expenses, whether they are paid by a third party or not. *Black v. Am. Bankers Ins. Co.*, 478 S.W.2d 434, 437–38 (Tex. 1972). Importantly, however, this Texas Supreme Court case does not address Section 41.0105, nor does it discuss insurance adjustments or write-offs.

This Court cannot award as compensatory damages any amounts not actually paid by the Plaintiff's insurance carrier due to a downward adjustment in the total charge. Because the

undersigned bankruptcy judge believes that he is bound by a decision of the United States District Court for the Southern District of Texas, this Court will abide by Judge Rainey's holding. *In re Depugh*, 409 B.R. 125, 141 n.5 (Bankr. S.D. Tex. 2009) (noting that "decisions by the district court are binding on the bankruptcy courts of that district") (citing *Rand Energy Co. v. Strata Directional Tech., Inc. (In re Rand Energy Co.)*, 259 B.R. 274, 276 (Bankr. N.D. Tex. 2001). *Contra Villarreal v. Showalter (In re Villareal)*, 413 B.R. 633, 641 (Bankr. S.D. Tex. 2009) (the Honorable Marvin Isgur, United States Bankruptcy Judge for the Southern District of Texas, holding that because one district judge is not bound by another judge of the same court and because bankruptcy courts operate as units of the District Court, *stare decisis* does not apply to the decisions of the district court). Accordingly, although the Plaintiff has requested that this Court award him actual damages of $20,587.75 (representing the total charges), this Court will only award the Plaintiff the sum of $7,477.10 (representing the actual amounts of $4,411.39 and $3,065.71 paid by the Plaintiff's insurance carrier and the Plaintiff, respectively).

The Debtor adduced no testimony about any other actual damages. Accordingly, actual damages total $7,477.10. [Finding of Fact No. 42].

>    *ii.*        *Punitive Damages*

In his complaint, the Plaintiff did not specifically plead for punitive damages. Both this Court and the Fifth Circuit have held, however, that a plaintiff is not required to specifically plead punitive damages. *Schexnayder v. Bonfiglio*, 167 F. App'x 364, 367 (5th Cir. 2006); *Smith v. Lounsbury (In re Amberjack Interests, Inc.)*, 326 B.R 379, 392 (Bankr. S.D. Tex. 2005) (holding that a plaintiff is required neither to specifically plead punitive damages nor to specifically cite grounds for the recovery of such damages in the complaint). Moreover, although the Plaintiff's complaint did not expressly plead for punitive damages, the Plaintiff's Proposed

Findings of Fact and Conclusions of Law expressly request punitive damages of $50,000.00. [Adv. Doc. No. 79, p. 7, ¶ 8]. Thus, prior to the beginning of trial, the Debtor was in fact on notice that the Plaintiff was seeking punitive damages of $50,000.00.[23] And, indeed, in closing argument, Plaintiff's counsel reiterated orally what he requested for his client in the Proposed Findings of Fact and Conclusions of Law: punitive damages of $50,000.00. [Tape Recording, May 17 12:48:01 p.m.].

This Court has previously held that a bankruptcy court may rely on state law to award exemplary damages even "where the Code does not specifically allow such measures." *In re Amberjack*, 326 B.R. at 391. Accordingly, because the Code is silent as to whether punitive damages may be awarded in a § 523(a)(6) action, section 41 of the Texas Civil Practice and Remedies Code provides the basis for any punitive damages award.[24] *Id.* at 392. This statute allows courts to impose exemplary damages where the harm results from: "(1) fraud; (2) malice; or (3) gross negligence." TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (Vernon 2010). "Malice" is defined as a "specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* at § 41.003. Specific intent means that "the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it." *Franklin Bank, S.S.B. v. Barnes (In re Barnes)*, 369 B.R. 298, 310 (Bankr. W.D. Tex. 2007) (quoting *Mission Res., Inc. v. Garza Energy Trust*, 166 S.W.3d 301, 313 (Tex. App.—Corpus

---

[23] Counsel for both parties had in fact exchanged proposed findings of fact and conclusions of law prior to trial, and they had also given the Court a signed copy of this pleading. Counsel had also given the Court a signed joint pre-trial statement. However, after trial, the Court discovered that none of these pleadings had been entered on the docket. Accordingly, the Court held a hearing on May 17, 2011, and a record was made to confirm that the parties had attempted to file the pleadings prior to trial but without success. These same pleadings have since been filed as adversary docket number 79. The key point is that counsel for the Debtor knew prior to trial that the Plaintiff was seeking $50,000.00 in punitive damages.

[24] "The party seeking punitive damages must obtain at least one finding of an independent tort with accompanying actual damages." *Tex. Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986).

Christi 2005), *rev'd on other grounds*, 268 S.W.3d 1 (Tex. 2008)). Texas law provides that punitive damages "are justified only upon proving fraud, malice, or gross negligence by clear and convincing evidence." *West v. Hsu (In re Advanced Modular Power Sys.)*, 413 B.R. 643, 683 (Bankr. S.D. Tex. 2009) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (Vernon 2010)).

This Court expressly finds that there is clear and convincing evidence that the Debtor acted with malice. The extreme disdain that the Debtor had toward the Plaintiff leaves little doubt that the Debtor had a specific intent to cause substantial injury to the Plaintiff. The Debtor's intense dislike for the Plaintiff arose for two reasons. First, the Debtor views himself as the ultimate macho man, and he came to view the Plaintiff as a pissant wimp. Why else would the Debtor send text-messages to the Plaintiff taunting him that he (*i.e.*, the Debtor) was more capable than the Plaintiff of sexually satisfying Ms. Wise? [Finding of Fact No. 7]. It takes a huge dose of disdain, plus a sizeable dose of narcissism, for the Debtor—presumably a mature adult—to stoop so low. Second, the Debtor's utter contempt for the Plaintiff arose from the FAA's investigation of the Debtor as a result of the Plaintiff's contacting the FAA to report that the Debtor was using drugs.[25] [Finding of Fact Nos. 8 & 9]. The sheer force of the Debtor's punch was no fluke, but rather indicates that the Debtor wanted to harm the Plaintiff and

---

[25] There is little doubt that the Plaintiff intended to end the Debtor's flying career by contacting the FAA. It is not surprising that "[n]o person may act or attempt to act as a crewmember of a civil aircraft . . . [w]hile using any drug that affects the person's faculties in any way contrary to safety." 14 C.F.R. § 91.17(a)(3) (2006). The Plaintiff surely knew that the Debtor could lose his license—and therefore his job—if the FAA believed that he was taking drugs. *See* 14 C.F.R. § 61.15(b)(2) (1973) (noting that the FAA may revoke or suspend a pilot's medical and pilot certificates if he violates § 91.17(a)); *Sorsenson v. Nat'l Transp. Safety Bd.*, 684 F.2d 683, 684–85 (10th Cir. 1982) (noting that the National Transportation Safety Board revoked a pilot's certificate after he violated federal regulations prohibiting the pilot from operating an airplane within eight hours of drinking alcohol or under the influence of alcohol). Further, even if the Debtor had never used drugs within the scope of his employment, the FAA may still revoke or suspend his license if he is convicted of violating a federal or state drug offense, which includes possession of drugs. 14 C.F.R. § 61.15(a)(2) (1973). So, when the FAA began investigating the Debtor after the Plaintiff reported him, the Debtor became angry at the Plaintiff, and this anger manifested itself in the punch which the Debtor landed on the Plaintiff's mouth.

believed the consequences of his actions were substantially certain to inflict harm on the Plaintiff. [Finding of Fact No. 24]. Therefore, punitive damages are appropriate.

In making an award of punitive damages, this Court must consider the purpose of punitive damages, which is to punish a defendant and deter future bad acts, not to compensate the Plaintiff. TEX. CIV. PRAC. & REM. CODE ANN. § 41.001 & 41.010 (Vernon 2010). This Court has considered the purpose of punitive damages and concludes that such an award would both punish the Debtor and deter others from acting similarly.

Texas law limits the amount of punitive damages that a court may award, capping them at the greater of: "(1)(A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000." TEX. CIV. PRAC. & REM. CODE ANN. § 41.008. While the award must be reasonably proportional to actual damages, there is no set ratio for measuring the reasonableness of the award, giving this Court ample discretion in awarding the amount of punitive damages. *In re Amberjack*, 326 B.R. at 392 (citing *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981)). Given the circumstances in this suit, the only definitive limitation on this Court is that it may not assess more than $200,000.00 in punitive damages against the Debtor.[26]

To determine the amount of the punitive damages award, this Court should consider evidence relating to: "(1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant." TEX. CIV. PRAC. & REM. CODE § 41.011 (Vernon 1995).

---

[26] $200,000.00 is greater than two times the amount of the Plaintiff's economic damages, establishing $200,000.00 as the cap on punitive damages.

(a)      The Nature of the Wrong

"The nature of the wrong refers to the injury or harm caused by the defendant's actions." *Baribeau*, 107 S.W.3d at 62. Here, the Plaintiff's injuries include: (1) a concussion; (2) laceration of the lip; and (3) bruised ribs. [Finding of Fact Nos. 34 & 37]. Moreover, as a result of these injuries, the Plaintiff has experienced difficulty in sleeping, loss of memory, headaches, and fatigue. [Finding of Fact Nos. 39–41]. He has also undergone—and continues to undergo—lip injections to reduce the scar tissue in his mouth. [Finding of Fact No. 39]. Given these circumstances, the Court concludes that this first factor favors imposition of punitive damages.

(b)      The Character of the Conduct Involved

Resorting to fisticuffs at a private holiday party in the civilized American society of the 21st century is unacceptable conduct—particularly when the punch-thrower is an American Airlines pilot whose very profession puts him in charge of protecting people's physical safety and necessarily requires him to keep his cool at all times. Apparently, the Debtor believes that he still lives in the bygone era of the Wild West; he is woefully wrong. The Court concludes that the character of the conduct in this instance favors the imposition of punitive damages.

(c)      The Degree of Culpability of the Wrongdoer

The Debtor—and **only** the Debtor—punched the Plaintiff in the mouth with as much force as he possibly could muster. [Finding of Fact Nos. 24–26]. Thus, the Debtor is 100% culpable. Accordingly, this third factor favors imposition of punitive damages

(d)      The Situation and the Sensibilities of the Parties Concerned

The situation and sensibilities of the parties concerned in this suit are stark in various respects. First, on a purely physical basis, the Plaintiff is 6'5", whereas the Debtor is 5'8" tall. [Finding of Fact No. 28]. Thus, at first blush, this situation would not favor imposition of

punitive damages. However, while the Plaintiff is taller than the Debtor, the latter is a stocky and athletic individual who is unquestionably capable of throwing a powerful punch. Additionally, when the Debtor threw his punch at the Plaintiff, the latter was terribly inebriated, slurring his speech, and stumbling around—and the Debtor was aware of the Plaintiff's woeful condition. [Finding of Fact Nos. 15, 21 & 24]. Hence, to the extent that the Debtor was at any disadvantage due to height and weight, this disadvantage was more than offset by the Plaintiff's inability to defend himself due to his drunken stupor.

Further, what would lead a grown man with no apparent  history of alcohol problems to attend a private party with his girlfriend of several months, become rip-roaring drunk, and start yelling unsavory comments at a particular individual (*i.e.*, the Debtor)? [Finding of Fact No. 23]. There is no question that the Debtor was attending the party with the Plaintiff's ex-wife, but by this time, the divorce had been final for several months, and, as was already noted, it was not as if the Plaintiff was alone at the party: Ms. Pilegge, whom he had been dating for many months, was attending the party with him. [Finding of Fact No. 10]. The Court finds that for the Plaintiff to conduct himself in the manner that he did, he must have accumulated a huge reservoir of resentment toward the Debtor.

The Court also finds that the situation and sensibilities as of the night of the Rapier party reflect why the Plaintiff greatly resented the Debtor. The Debtor not only had begun an intense and furtive sexual relationship with Ms. Wise—which she deliberately hid from her husband— but the Debtor had also gone out of his way to humiliate the Plaintiff about his (*i.e.*, the Plaintiff's) sexual inadequacies once the Plaintiff discovered the illicit relationship. [Finding of Fact Nos. 3–5 & 7]. Long before throwing the punch that knocked out the Plaintiff while he was in a drunken state, the Debtor had been taunting the Plaintiff unmercifully in text messages about

how he (*i.e.*, the Debtor) was sexually satisfying Ms. Wise more than the Plaintiff ever had. [Finding of Fact No. 7].

It is one thing for the Debtor to have begun an illicit relationship with the Plaintiff's wife; indeed, it takes two to tango, and Ms. Wise was more than willing to intimately dance with the Debtor. [Finding of Fact Nos. 3 & 4]. But, it is beyond the pale for the Debtor to send text messages to the Plaintiff taunting him about how the Debtor was sexually satisfying Ms. Wise more than the Plaintiff ever could. [Finding of Fact No. 7]. There can be no denying that such messages were malicious: their very content was aimed at psychologically harming the Plaintiff's self-esteem.

Aside from psychologically attacking the Plaintiff's ability to fulfill his marital duties in the bedroom, the Debtor's actions have also had a long-term physical impact on the Debtor. First, the Plaintiff is still seeing Dr. Fortes, who is doing lip injections to attempt to reduce the scar tissue in the Plaintiff's mouth. [Finding of Fact Nos. 39 & 41]. Second, although the Plaintiff has recovered significantly from the effects of the concussion that he sustained, the Plaintiff continues to experience fatigue, memory loss, lack of concentration, and headaches. [Finding of Fact No. 41].

This Court concludes that all of the circumstances described above favor imposition of punitive damages. However, it is important to recall that the individual whose conduct led to the altercation was the Plaintiff. It was the Plaintiff who became intoxicated at the party [Finding of Fact No. 15]; who started verbally abusing the Debtor and Ms. Wise as they departed the party [Finding of Fact No. 18]; who continued his verbal assault as the Debtor and Ms. Wise walked down the driveway of the Rapier residence to proceed to the Debtor's truck [Finding of Fact No. 18]; and who first resorted to physical contact by shoving, first, Ms. Rocher, then Logsdon, and

finally the Debtor. [Finding of Fact Nos. 22 & 23]. The Debtor would have never injured the Plaintiff if the Plaintiff had never begun his verbal onslaught. Indeed, even after the Plaintiff began his verbal abuse, the Debtor would probably have never harmed the Plaintiff if the Plaintiff had refrained from instigating the shoving matches. Nevertheless, having created the hostile environment that he did, the Plaintiff opened the door for the Debtor to step in and defuse the bomb of resentment that had welled up inside the Plaintiff. In the parlance of the grammar school playground: "the Plaintiff started the fight, and the Debtor finished it."

Moreover, the only reason that the Debtor departs this suit with liability to the Plaintiff is because of the unreasonable manner in which the Debtor "finished it." Fulfilling his macho persona, the Debtor hauled off and slugged the Plaintiff as hard as he possibly could, with the full knowledge that the Plaintiff, who was in a drunken stupor, could not possibly have defended himself. [Finding of Fact Nos. 24–26].

Overall, on balance, this fourth factor favors imposition of punitive damages, but the argument in favor of such a result is not as compelling as the argument with respect to any of the first three factors.

>        (e)      The Extent to which the Conduct Offends a Public Sense of Justice
>                 and Propriety

The Debtor had a choice as the Plaintiff shouted at Ms. Wise and him while they were at the end of the driveway. He could have quickened his pace and encouraged Ms. Wise to do the same in order to arrive at his truck (parked at least one block away), and to avoid any confrontation with the Plaintiff. Instead, the Debtor chose to walk back up the driveway and meet the intoxicated Plaintiff face-to-face. [Finding of Fact No. 23]. By so doing, the Debtor escalated the chance for a physical confrontation with the Plaintiff. Of course, with the Debtor in close proximity to the Plaintiff, the latter shoved the Debtor while jousting with him verbally.

[Finding of Fact No. 23]. Rather than retreat, or attempt to run around the Plaintiff to gain access to the Rapier house and request assistance from the hosts and other guests, the Debtor clenched his fist and threw as hard a punch as he could possibly throw squarely on the Plaintiff's lip. This punch completely knocked out the Plaintiff and caused damage to his head, mouth, teeth, and ribs. [Finding of Fact Nos. 24–26, 34, 37–41].

The Court finds that the Debtor's conduct is offensive to a public sense of justice and propriety. Although it may not be on the same level as, say, a toxic tort or a large-scale ponzi scheme that eviscerates a family's life savings, sucker-punching an inebriated individual in the face is offensive, regardless of any verbal abuse from the drunken individual. Moreover, even though the Plaintiff shoved the Debtor while exchanging verbal insults with him, there was no need for the Debtor to wind up and throw a hard punch into the Plaintiff's mouth. In sum, the Debtor's retaliation to the Plaintiff's shove was so excessive that it offends a public sense of justice and propriety. Therefore, the Court concludes that this fifth factor favors imposition of punitive damages, although by no means a substantial amount.

(f)     The Net Worth of the Debtor

The Debtor's schedules reflect that he owes $5,020,000.00 in debt securing real property, and $2,025,006.00 in unsecured, non-priority debt (including a $60,000.00 gambling debt). [Main Case, Doc. No. 1, pp. 6, 28]. However, the Debtor's debts have been discharged as of today (except the debt related to this adversary proceeding).   [Main Case, Doc. No. 43]. Moreover, according to the Debtor's Schedule I, his monthly gross salary totals $9,000.00 per month. [Main Case, Doc. No. 1, Schedule I, p. 32]. Therefore, while the Debtor's net worth was non-existent as of the petition date, because the Debtor has received a general discharge, he will

not have to pay the over $7 million in debt for which he was liable on the date of the filing of his Chapter 7 petition. [Main Case, Doc. No. 1, Summary of Schedules, p. 6].

He also will generate relatively significant income in the future in his position as an American Airlines pilot. However, because the Debtor is divorced, with his wages garnished $2,000.00 per month for spousal and child support, the Debtor will have less disposable income for the near future than would otherwise be the case. [Main Case, Doc. No. 1, Schedule I, p. 33–34]. Indeed, according to the Debtor's Schedule I, his current net disposable income per month is $90.00. [Main Case, Doc. No. 1, Schedule I, p. 34]. Of course, the Debtor may—indeed, should—have to sacrifice some of the luxuries that are reflected in his Schedule J in order to have more disposable cash with which to reduce the debt that he now owes to the Plaintiff.

For example, the Debtor's Schedule J reflects a monthly cable television expense of $100 and a monthly cell phone expense of $350. [Main Case, Doc No. 1, Schedule J, p. 35]. As another example, the Debtor's Schedule J reflects a monthly mortgage or rental payment of $3,000.00. [Main Case, Doc. No. 1, Schedule J, p. 34]. It is curious that the Debtor's Schedule G reflects that he has a lease agreement with Ms. Wise (for her house in Houston) and a separate lease agreement with Ventura Lofts (which is also in Houston). [Main Case, Doc. No. 1, Schedule G, p. 30]. Therefore, it appears that the Debtor has two places of residence in Houston. At trial, he testified that he has moved in with Ms. Wise. [March 18, 2011 Tr. 15:5–10]. Accordingly, there is no reason for the Debtor to be leasing a loft from Ventura Lofts—a very toney residential complex in West Houston.[27] Thus, with some sacrifice of luxuries, the Debtor

---

[27] The Debtor also testified at trial that he also has a home in Edwardsburg , Michigan. [March 18, 2011 Tr. 14:3–8]. It is unclear to the Court whether the $3,000.00 monthly payment shown on the Debtor's Schedule J is being used to pay rent on just the Ventura Lofts, or on both the Ventura Lofts and on Ms. Wise's residence, or on the Ventura Lofts, Ms. Wise's residence, and the Edwardsburg property. In any event, there is no question that the Debtor needs to sacrifice so that he gives up two of his three residences; he only needs one abode.

will have a higher net disposable income than $90.00. Admittedly, although the Debtor will not have substantial excess monthly cash flow to retire quickly the debt owed to the Plaintiff, he will at least be able to pay it off over time.[28] Thus, this sixth factor does not favor any award of punitive damages, or at least not a substantial award.

A review of the six factors on which the Court is required to focus in making a determination of the amount of punitive damages indicates that the first, second, third, and fifth factors favor imposition of a goodly sum of punitive damages, while the fourth and sixth factors favor either a modicum of such damages or no damages at all.

The Plaintiff has requested $50,000.00 in punitive damages. Given that the statutory ceiling is $200,000.00, and the Plaintiff's actual damages are $7,477.10, the Court concludes that the request for $50,000.00 is within the realm of reasonableness. *See, e.g.*, *Durban v. Guajardo*, 79 S.W.3d 198 (Tex. App.—Dallas 2002, no pet.) (affirming award of punitive damages of $25,000.00 where the maximum amount of punitive damages could have been $200,000.00, and where the actual damages totaled $7,000.00). Indeed, the amount of $50,000.00 is only a quarter of the maximum that the Plaintiff could receive. However, merely because $50,000.00 is within the realm of reasonableness does not automatically mean that the Court should award this amount.

Because only four out of the six factors weigh in favor of awarding a significant sum of punitive damages, it is logical in determining the appropriate amount to award to multiply the amount requested by the Plaintiff (*i.e.*, $50,000.00) times 4/6. This mathematical calculation

---

[28] The Court in no way is ruling that the Debtor is entitled, as a matter of law, to pay off this nondischargeable debt over a period of time. Indeed, the Plaintiff will certainly be entitled to immediately exercise all of his collection remedies under applicable law. The Court is simply suggesting that as a practical matter, given the Debtor's present salary, the Plaintiff may end up having to collect this debt over a period of time even though he may exercise all of his collection remedies immediately.

produces the following result: $50,000.00 x 4/6 = $33,333.33. Therefore, this Court concludes that the Plaintiff is entitled to punitive damages of $33,333.33.

              iii.     *The Total Amount of Damages Owed by the Debtor to the Plaintiff*

For the reasons set forth above, the actual damages awarded to the Plaintiff total $7,477.10, and the punitive damages assessed against the Debtor are $33,333.33. Therefore, the total amount of damages is $40,810.43, and it is this amount for which the Debtor is liable to the Plaintiff (in addition to pre and post judgment interest, as discussed *infra*). This Court must now determine whether this debt of $40,810.43 is nondischargeable under § 523(a)(6).

## D. The Debtor's Actions Result in his Debt to the Plaintiff being Nondischargeable under 11 U.S.C. 523(a)(6)

11 U.S.C. § 523(a)(6) states, in pertinent part, that "a discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . [that is the result of] willful and malicious injury by the debtor to another entity." 11 U.S.C. § 523(a)(6). In explaining the meaning of § 523(a)(6), the Supreme Court has held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). The Supreme Court has further held that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of section 523(a)(6)." *Id.* at 64.

The Fifth Circuit expanded on the *Geiger* interpretation of § 523(a)(6) by holding that "'willful and malicious injury' is a unitary concept entailing a single two-pronged test." *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir. 1998). There must either be an "objective substantial certainty of harm or a subjective motive to cause harm." *Id.* at 606. When applying this two-pronged test, courts should look at the record as a whole, not simply focus on specific pieces of evidence. *See Suggs v. Stanley (In re Stanley)*, 224 F. App'x 343, 348 (5th Cir.

2007) (holding that the bankruptcy court's finding of willful and malicious intent was not in clear error, based on a reading of the entire record) [29]

1.    Objective Substantial Certainty of Harm

The Fifth Circuit provides clear guidance on whether punches to the face are substantially certain to cause an injury. "[H]aymakers, like most garden-variety punches to the face, are objectively very likely to cause harm." *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x 360, 362 (5th Cir. 2007). In this suit, the Debtor's intentional punch to the Plaintiff's face was very much a haymaker. [Finding of Fact Nos. 24–26]. Indeed, it was a punch so hard that not only did the Plaintiff fall to the ground in an unconscious state, but the Debtor also fell to the ground and his own hand required bandaging. [Finding of Fact Nos. 26 & 27]. Accordingly, this Court concludes that the Debtor's punch objectively was substantially certain to cause injury to the Plaintiff.[30]

2.    Subjective Motive to Cause Harm

In addition to an objective substantial certainty of harm, this Court also concludes that the Debtor had a subjective motive to cause harm. In analyzing the subjective motive to harm, Bankruptcy Judge Marvin Isgur has noted, "the Fifth Circuit equated having a subjective motive to harm to acting with the desire to cause injury." *Guerra & Moore, Ltd. LLP v. Cantu (In re Cantu)*, 400 B.R. 104, 108 (Bankr. S.D. Tex. 2008) (citing *In re Miller*, 156 F.3d at 604).

---

[29] A creditor must prove the willful and malicious standard for § 523(a)(6) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005).

[30] The facts here stand in stark contrast to *In re Bullard*. In *In re Bullard*, a suit out of the Eastern District of Arkansas, two men went out to a bar together and got into a discussion about unions and organized labor. *Hidy v. Bullard (In re Bullard)*, 2011 Bankr. LEXIS 274, at *2. The conversation took a turn for the worse, and one of the men threw a glass down at the table, which then shattered, with parts of the glass hitting the other man's eye. *Id.* at *4. The Court held that the debt owed by the defendant, that related to the injuries suffered by the plaintiff, was not nondischargeable under § 523(a)(6) because there was insufficient proof to establish that the defendant's actions were malicious. *Id.* at *27. Stated differently, there was insufficient proof that the debtor/defendant threw the glass such that it was substantially certain to cause injury to the plaintiff.

However, debtors rarely admit to having a subjective motive to cause harm. *In re Vollbracht*, 276 F. App'x at 361. Of course, most cases turn on whether a debtor's actions were "substantially certain to result in injury." *Id.* (quoting *In re Miller*, 156 F.3d at 606). 11 U.S.C. § 523(a)(6) should "trigger[] in the lawyer's mind the category 'intentional torts,' which generally require that the actor intend the *consequences* of an act, not simply the act itself." *Geiger*, 523 U.S. at 58.

Hence, the evidence demonstrates that the Debtor and the Plaintiff held mutual hatred for one another. After the Debtor took up with the Plaintiff's wife and thereafter sent text messages to the Plaintiff taunting him about his inability to sexually satisfy his wife, the cuckolded Plaintiff contacted the FAA and reported to that governmental agency that the Debtor was illegally using drugs—an allegation that prompted the FAA to investigate the Debtor. [Finding of Fact Nos. 3, 4, 7 & 8]. Although the FAA did not decertify the Debtor's pilot license, [Finding of Fact No. 8], there is no doubt that the Plaintiff intended to deprive the Debtor of his license by communicating this information to the FAA. This would have deprived the Debtor of his ability to earn a living as a pilot for American Airlines, or, for that matter, with any other airline, company, or individual.[31] Thus, by the time the Plaintiff and the Debtor attended the holiday party at the Rapier home, the Debtor had played a significant role in ruining the Plaintiff's marital and personal life. Similarly, the Plaintiff had attempted to play a substantial role in ruining the Debtor's professional life.

Thus, when these two individuals found themselves in the front yard of the Rapier home in the early morning of December 6, 2009, it is a vast understatement to say that there was no love lost between the two. They had an exceedingly contemptuous view of one another. And, when the Debtor closed his fist, swung back his arm, and punched the Plaintiff with such ferocity

---

[31] *See supra*, note 25

that he not only knocked out the Plaintiff, but also fell to the ground himself with a damaged hand, the Debtor intended to harm the Plaintiff. This Court can reach no other conclusion, given the high level of personal animosity between these two individuals, the force of the punch leveled by the Debtor, the location of the punch, the Plaintiff's losing consciousness, the severity of the damage to the Plaintiff's body, and the damage to the Debtor's own hand.

The Court is well aware that, at trial, the Debtor testified that he did not intend to harm the Plaintiff. [March 18, 2011 Tr. 104:5–7]. The Court finds that this testimony is not credible. If the Debtor had slapped the Plaintiff with an open hand on the Plaintiff's cheek, or had simply shoved the Plaintiff, this Court might have found the Debtor's statement credible. Given what actually happened, however, the Debtor's protestation is simply not believable.[32]

---

[32] Ms. Pilegge testified that when the Debtor and the Plaintiff were exchanging verbal insults (after the Debtor had returned up the driveway to confront the Plaintiff), Ms. Pilegge walked over to Ms. Wise, who was at the end of the driveway, to ask her assistance in separating the Plaintiff and the Debtor and "to get Jimmy [*i.e.*, the Debtor] out of there." [March 18, 2011 Tr. 61:6–19]. According to Ms. Pilegge, after she requested assistance from Ms. Wise, Ms. Wise responded that the Plaintiff "brought this upon himself." [March 18, 2011 Tr. 61:16–21]. Ms. Wise did not dispute Ms. Pilegge's testimony, and in fact seemed to corroborate it. [March 18, 2011 Tr. 125:16–126:2]. The Court finds that this particular testimony of Ms. Pilegge is credible and that she did, in fact, request assistance from Ms. Wise, who declined by saying that the Plaintiff "brought this upon himself." At trial, when Ms. Pilegge was asked her interpretation of Ms. Wise's response, Ms. Pilegge stated that "I took it to mean that Scott [*i.e.*, the Plaintiff] brought this upon himself and deserved what Jimmy [*i.e.*, the Debtor] was about to do to him." [March 18, 2011 Tr. 61:20–24]. Ms. Pilegge's interpretation of Ms. Wise's response is a reasonable interpretation. And, this interpretation indicates that at the time the Debtor turned around at the end of the driveway and started walking back up the driveway to confront the Plaintiff, the Debtor told Ms. Wise—who remained at the end of the driveway—that he was going to punch the Plaintiff. Accordingly, the Court finds that at the time the Debtor turned around and began walking toward the Plaintiff, he intended to punch the Plaintiff. Although the Debtor attempted to convince this Court that he was merely defending himself and that he really did not intend to harm the Plaintiff, the Court finds the Debtor's testimony on this point not to be credible.

Indeed, his lack of credibility on this point was apparent when, in response to the Plaintiff's counsel posing certain straightforward questions about the Debtor punching the Plaintiff, the Debtor attempted to avoid answering these questions. For example, the Plaintiff's counsel asked him the following question: "You turned and struck Scott Wise in the face with your fist, didn't you." The Debtor's response was to turn to the undersigned judge and say: "I'm not sure of the question, Your Honor." [March 18, 2011 Tr. 38:19–22]. Such a tactic is disingenuous. English is the Debtor's first language, and there was nothing ambiguous or confusing about the question. Indeed, in the Joint Pre-Trial Statement filed and signed by counsel for both parties, in the section entitled "Admissions of Fact," it is expressly set forth that "Defendant [*i.e.*, the Debtor] admits that he struck Plaintiff and that Plaintiff was injured." [Adv. Doc. No. 79, p. 2, ¶ V]. The Court finds that the Debtor knew full well the meaning of the question posed to him, and his feigned confusion undermines his credibility.

For all of these reasons, this Court concludes that the Debtor had a subjective motive to cause harm when he punched the Plaintiff.

Thus, under the two-prong test articulated by the Fifth Circuit in *Miller*, the Plaintiff has met his burden with respect to both tests. Under either test, the Debtor's conduct was willful and malicious under § 523(a)(6).

## E. The Debtor's Actions Were Not Substantially Justified under the Circumstances

While this Court concludes the Debtor had a subjective motive to cause harm and that his actions had an objective substantial certainty of causing harm, this is not the end of the analysis. The Fifth Circuit has held that for a debtor's actions to be considered willful and malicious under § 523(a)(6), the plaintiff must satisfy the two-prong test **and** the defendant must fail to prove that he was "sufficiently justified under the circumstances." *Vollbracht*, 276 F. App'x at 362 (5th Cir. 2007).Stated differently, the Fifth Circuit has constructed an exception to the general two-prong test. This exception is **not** limited to the doctrine of self defense—indeed, it is a more expansive affirmative defense, allowing a bankruptcy court to engage in a fact-specific analysis to determine whether "an injury otherwise falling under [the] two-part test is sufficiently justified to render it not 'willful and malicious.'" *Id.* at 362 n.8. To determine whether the injury in this suit was "sufficiently justifiable under the circumstances," this Court will review a number of other § 523(a)(6) opinions that involve physical attacks similar to the "haymaker" that the Debtor threw at the Plaintiff.[33]

---

[33] None of these other cases actually use the phrase "sufficiently justified under the circumstances." That language is apparently unique to the Fifth Circuit. The Court nevertheless believes that a review of these "physical attack" opinions will assist in the analysis that this Court believes it is required to do to determine whether the Debtor's punch was "sufficiently justified under the circumstances."

1.   *In re Taylor*

The United States Bankruptcy Court for the Northern District of Ohio reached a conclusion similar to this Court's in a case that likewise involved the intersection of assault and alcohol consumption. *Kleman v. Taylor* (*In re Taylor*), 322 B.R. 306 (Bankr. N.D. Ohio 2004). As in this suit, both parties in *Taylor* attended a social gathering where a large amount of alcohol was served; the plaintiff took part in the alcohol consumption, while the defendant refrained. *Id.* at 307. During an altercation between the parties, the plaintiff pushed the defendant, and the defendant responded by striking the plaintiff in the face, breaking his jaw. *Id.* at 307–08.

In concluding that the defendant's action was not necessary to prevent a further assault, the bankruptcy court noted that even when someone is struck first, they may not retaliate in a manner that exceeds the force necessary to defend oneself. *Id.* at 309. The fact that the defendant did not sustain an injury from the plaintiff's push was highly probative that the push was not severe. *Id.* at 310. In light of Ohio's general duty to retreat, the defendant undermined his ability then to claim self-defense by declining to leave the premises after being pushed.

In this suit, the Plaintiff only shoved the Debtor. [Finding of Fact No. 23]. The Plaintiff never attempted to hit the Debtor, and brandished no weapon. [Finding of Fact No. 23]. Moreover, the Plaintiff was very inebriated, whereas the Debtor was sober. [Finding of Fact Nos. 17 & 21]. The Court concludes that the Debtor, just like the debtor in *Taylor*, used excessive force by punching the Plaintiff in the mouth as hard as he could. Accordingly, *Taylor* weighs against a conclusion that the Debtor has acted justifiably under the circumstances.

2.   *In re Trudeau*

*In re Trudeau* is a bankruptcy case from the United States Bankruptcy Court for the District of Massachusetts. 35 B.R. 185 (Bankr. D. Mass. 1983). The suit there dealt with a

44

plaintiff's request for a debt arising from a state court judgment to be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(6). *Id.* at 187. Like this suit, there was bad blood between the plaintiff and the defendant in *Trudeau. Id.* at 186. The plaintiff had a history of ridiculing the defendant for his alcoholism from November 30, 1979, to January 23, 1980. *Id.* On that latter date, the defendant claimed that the plaintiff made another derogatory comment, while the plaintiff alleged that the provocation was the defendant's refusal to turn off the lights (which apparently acted as a provocation for the fight). *Id.* Subsequently, a scuffle broke out between the two and the defendant landed two punches, knocking down the plaintiff and giving him two cuts near his eye. *Id.*

The bankruptcy court concluded that the evidence adduced at trial proved that the injury was willful and malicious. *Id.* at 187. In reaching this conclusion, the bankruptcy court noted the following: "Even assuming that the plaintiff ridiculed the defendant just preceding the battery, that does not constitute an automatic defense. Anger, seldom if ever justifies violence." *Id.* at 187–88.

The facts in *Trudeau* are similar to the facts here. In *Trudeau*, as in this suit, there was a history of bad blood. In *Trudeau*, as in this suit, words were exchanged before fisticuffs broke out. [Finding of Fact No. 23]. This Court agrees that bad blood and bad words do not justify grown men resorting to physical violence to solve their differences. *Trudeau* weighs against the conclusion that the Debtor in this suit acted justifiably under the circumstances.

3.   *In re Rowland*

In *In re Rowland* (which involved an appeal to the district court from a New Jersey bankruptcy court's ruling), the defendant and the plaintiff were involved in a fight when both were sixteen years old. *In re Rowland*, No. 88-1099, 1988 U.S. Dist. LEXIS 5487, at * 1 (Dist.

N.J. 1988). The debtor indisputably admitted to punching the plaintiff and "causing him to, at least, fall to his knees, and . . . there was blood emitting from the mouth of the plaintiff." *Id.* at *3. The district court concluded that it had no basis for disturbing the bankruptcy court's finding that the defendant punched the plaintiff in the mouth. *Id.* at *8. Nor did the district court disagree that "it is readily apparent that when someone swings a fist at someone damages are going to flow." *Id.* For those reasons, the district court affirmed the bankruptcy court's conclusion that the damages flowing from the debtor's punch were nondischargeable pursuant to § 523(a)(6).

While *Rowland* provides few details about the fight in question, this Court focuses on the district court's statement that "it is readily apparent that when someone swings a fist at someone damages are going to flow." *Id.* Of course, in *Rowland*, as in the suit at bar, the debtor punched the plaintiff in the mouth, causing blood to flow. *Id.* at *3. [Finding of Fact Nos. 24 & 25, 34]. Moreover, as in this suit, the debtor in *Rowland* admitted to punching the plaintiff. [Finding of Fact No. 24]. Accordingly, *Rowland*'s conclusion that "when someone swings a fist at someone damages are going to flow" weighs against a conclusion that the Debtor acted justifiably under the circumstances.

    4.    *In re Wright*

Another punch-related §523(a)(6) action is from the United States Bankruptcy Court for the Western District of New York. *Fisher v. Wright (In re Wright)*, No. 08-1075, 2008 Bankr. LEXIS 4558 (Bankr. W.D.N.Y. July 21, 2008). The facts in *Wright* can be summed up in the defendant/debtor's own words:

> I pulled my [sweater] back down, noticed my nose was bleeding, um, picked up my hat, put my nose back in place. I saw the person that struck me was walking, out of the corner of my eye, because being a bar fight [sic] you don't know if this person is going to come back after me. So I kind of was [sic] keeping my eye on him. I picked up my hat, seen [sic] him out of the corner of my eye walking around. I was gaining my composure. I thought to myself, this guy is not going to

get away with punching me in the face, and I went and hit the person, Mitch, which [sic] I thought was the person hitting me.

*Id.* at *1–2.

The bankruptcy judge concluded that the defendant's punch was intentional. *Id.* at *7. That there was an alleged excuse (*i.e.*, reprisal) for the defendant's actions was insufficient to prevent a finding of nondischargeability. *Id.* at *7–8. "When talking about the intentional infliction of serious physical injury, however, reprisal is never a cause or excuse that is a 'just cause or excuse. *Id.* at *7 (citing *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859 (1st Cir. 1997)).

Again, the facts in *Wright* are similar to the facts here. In *Wright*, the bankruptcy court concluded that the debt was nondischargeable, even when there was an alleged excuse for the defendant's actions. The defendant in *Wright* knew that he had been hit, and therefore decided to punch the plaintiff, even though the defendant was no longer in danger. It was an act of pure reprisal. Here, the Plaintiff pushed the Debtor and the Debtor decided to respond by punching the Plaintiff, even though: (a) the Plaintiff was very inebriated, staggering, and slurring his words (a condition hardly conducive to the Plaintiff being able to inflict serious physical injury or to instill fear of imminent danger); and (b) neither the Debtor nor his friends were drunk. This means that they were capable of quickly walking away from the Plaintiff, for in his drunken state of stupor, he would not have been able to catch up with them. [Finding of Fact Nos. 17, 19 & 21]. Accordingly, *Wright* weighs against a conclusion that the Debtor acted justifiably under the circumstances.

5.      *In re Mathews*

An example of when a defendant's act was "sufficiently justified"—and thereby sufficient to defeat the plaintiff's request for a judgment of nondischargeability—is demonstrated in *In re Mathews. Sustache v. Mathews (In re Mathews)*, 433 B.R. 732 (Bankr. E.D. Wisc. 2010). Creditors—*i.e.*, the estate and parents of a boy who was punched—filed a complaint alleging that their claim against the defendant was nondischargeable pursuant to § 523(a)(6).

This sad story began while the defendant was at work, when he began receiving harassing telephone calls from an unknown number. *Id.* at 734. The person on the phone called the defendant names, threatened him, and challenged him to a fight. *Id.* The caller, a boy, gave the defendant the address to a party and the defendant arrived at the party with five or six of his friends. *Id.* Unfortunately, however, forty to fifty high school students gathered outside the house where the party was held, including the boy who had been making the telephone calls (and who would later die). *Id.* The crowd formed a circle around the two and began yelling for a fight, egging the two on. *Id.* The defendant testified that he was afraid he would be harmed if he tried to escape the confrontation. *Id.* Then, the boy pushed the defendant, and the defendant responded by punching the boy in the face.[34] *Id.* at 735. The boy did not get up. *Id.* Another boy then punched the defendant in the face and he fell to the ground, running away after he got up. *Id.*

The bankruptcy court concluded that the defendant's conduct, while willful, was not malicious. *Id.* at 739. Indeed, the Court found that "judging the [defendant's] beliefs and conduct in comparison to what a reasonable 16-year old would believe," the defendant reasonably believed that "his life was in danger or that he was likely to suffer great bodily harm." *Id.* The

---

[34] In *Mathews*, the boy who made the call was also drunk when he absorbed the defendant's punch. *Id.* at 739.

bankruptcy court concluded that striking the boy with one punch was sufficient force necessary to save his life and protect himself from severe injury. *Id.*

The facts present in *Mathews* showing sufficient justification are not present in this suit. In *Mathews*, the punch was thrown by a scared teenager, whereas in this suit, the punch was thrown by a grown man whose very profession requires him to keep his cool. Moreover, in *Matthews*, approximately fifty students surrounded the defendant, egging him on to fight. The defendant therefore legitimately feared imminent harm if he refused to fight. Here, however, the Debtor was surrounded by no one and he could have easily walked away from the drunken Plaintiff. [Finding of Fact No. 13]. The Plaintiff, in his drunken stupor, would have had great difficulty pursuing the Debtor and his three companions had they quickly walked toward the Debtor's truck. This truck was at least one block away from the Rapier residence and possibly more than one block if Ms Wise, Ms. Rocher, and the Debtor are to be believed. [March 18, 2011 Tr. 124:5–7]; [April 5, 2011 Tr. 12:12–16, 42:7]. Under these circumstances, the Court concludes that the Debtor, unlike the defendant in *Matthews*, could not reasonably have feared imminent harm.[35] For all of these reasons, *Matthews* weighs against a conclusion that the Debtor's actions in this suit were justified under the circumstances.

6.     *In re Owens*

Finally, *In re Owens* provides an example in which a defendant's unreasonable response to a situation resulted in a finding of nondischargeability under § 523(a)(6). *Reed v. Owens (In re Owens)*, No. 09-7142, 2011 Bankr. LEXIS 973 (Bankr. E.D. Va. Mar. 17, 2011). Late at night, a

---

[35] The Debtor testified at trial that he feared imminent harm when the Plaintiff shoved him: "I thought I was in danger." [March 18, 2011 Tr. 104:8–11]. The Court does not find this to be credible testimony. Unlike the defendant in *Mathews*, the Debtor here was not surrounded by anyone; he could have quickly walked toward the street or gone back into the Rapier home, and the Plaintiff—in his drunken state—would not have been able to catch him. [Finding of Fact No. 21]. Indeed, as already noted, the Plaintiff was so intoxicated that he was slurring his speech, staggering and stumbling, and barely able to stand. [Finding of Fact No. 21]. In this condition, the Court finds that the Plaintiff could not have caught up and harmed the Debtor if the Debtor had quickly walked toward the street to his truck or gone back into the Rapier residence to request assistance from the hosts and remaining guests.

fight had broken out among numerous people in a parking lot. The plaintiff was engaged in the fight, and as the fight was winding down, the defendant barreled toward the plaintiff and tackled him into a fence. *Id.* at *24. The two scuffled, and eventually, the plaintiff was lying on the ground while the defendant was standing up. *Id.* At this point, the defendant could have retreated with the situation neutralized. *Id.* Instead, the defendant kicked the plaintiff at least twice while the plaintiff attempted to get up. *Id.*

The bankruptcy court concluded that the defendant's actions were willful and malicious. It explained its reasoning as follows:

> In the instant matter, Defendant testified that a large crowd had gathered . . . yet Defendant was the **only** person to interject himself into the altercation . . . . *Phillips* is also instructive because the defendant-debtor continued to strike the plaintiff with the pool cue when the plaintiff was on the ground. "Although the Court might have been able to believe that [defendant-debtor] did not intend to strike [plaintiff] in the head the first time, such a doubt evaporated when the disinterested witnesses testified he hit [plaintiff] in the head a second time when [plaintiff] was already on the floor." That court held that this met the willfulness prong of § 523(a)(6) pursuant to *Geiger*.
>
> . . .
>
> The only logical and rational conclusion that the Court can draw from the Defendant's repeated and continuous assault of Plaintiff, in light of the chance to withdraw and Plaintiff's submission, is that Defendant's actions were willful and done with the intent to injure Plaintiff.

*Id.* at *45, *48. As such, the bankruptcy court in *Owens* concluded that the defendant's actions were both willful and malicious. *Id.* at *50.

Like the aggressor in *Owens*, the Debtor here was the **only** person to interject himself into the altercation. [Finding of Fact Nos. 22–24]. Additionally, like the aggressor in *Owens*, who twice struck the plaintiff with a pool cue while the plaintiff was on the ground, the Debtor here used much more force than was reasonably necessary. [Finding of Fact Nos. 26 & 27]. The Debtor could have simply pushed the Plaintiff away, or quickly walked away. Instead, the

Debtor chose to hit the Plaintiff with such force that he knocked the Plaintiff unconscious, causing him to fall to the ground. [Finding of Fact No. 25]. Accordingly, *Owens* weighs against a conclusion that the Debtor's actions were justified under the circumstances.

In sum, all six cases above weigh against the Debtor. For all of the reasons set forth above, this Court concludes that the Debtor's actions were not sufficiently justifiable under the circumstances, and, therefore, he engaged in willful and malicious conduct pursuant to 11 U.S.C. 523(a)(6). Accordingly, the actual damages of $7,477.10, plus the punitive damages of $33,333.33, plus any allowed prejudgment interest and post judgment interest, constitute a nondischargeable obligation.[36]

### F.   The Plaintiff is Entitled to Prejudgment Interest and Post judgment Interest, but not Attorneys' Fees

1.   Prejudgment Interest

Under Texas law, prejudgment interest may be awarded if either an "enabling statute" or the "general principles of equity" allow such an award. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998) (citing *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985)). Texas Finance Code § 304.102 specifies that damages relating to personal injury earn prejudgment interest. TEX. FIN. CODE ANN. § 304.102 (Vernon 2010). Here, the Debtor assaulted the Plaintiff, which clearly fits within the category of "personal injury." Accordingly, the Court concludes that it is mandatory that the Plaintiff receive prejudgment interest. Prejudgment interest may not be assessed or recovered, however, on an award of punitive damages. TEX. CIV. PRAC. & REM. CODE ANN. § 41.007 (Vernon 2010).

---

[36] "When the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages . . . are likewise nondischargeable." *Gober v. Terra+Corp. (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir. 1996) (citing *Stoke v. Ferris (In re Stokes)*, 150 B.R. 388

Under Texas law, "[t]he prejudgment interest rate is equal to the post judgment interest rate applicable at the time of the judgment." TEX. FIN. CODE § 304.103; *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002) (holding that under Texas law, the rate of prejudgment interest "accrue[s] at the same rate as post judgment interest."); *see also Bob Anderson v. Mega Lift Sys., L.L.C. (In re Mega Sys., L.L.C.)*, No. 04-6085, 2007 WL 1643182, at *10-11 (Bankr. E.D. Tex. 2007). The post judgment rate is statutorily set at the "prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation" unless this rate is less than five percent or more than fifteen percent. TEX. FIN. CODE § 304.003(c). Specifically, Section 304.003(c)(2) provides that the judgment rate shall be set at 5% if the current rate is less than 5%. The current prime rate is 3.25%.[37] Therefore, pursuant to Section 304.003(c)(2) of the Texas Finance Code, the Court will apply a 5% interest rate to this prejudgment award. "[P]rejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered. Prejudgment interest is computed as simple and does not compound." *Id.* There is nothing in the record to show when the Debtor received written notice of the Plaintiff's claim. The record does show, however, that the Plaintiff's suit against the Debtor was filed March 29, 2010. [Adv. Doc. No. 1]. Therefore, prejudgment interest accrues from March 29, 2010 until the date of the judgment against the Debtor.

Because this Court has concluded that the Texas Finance Code requires that prejudgment interest be awarded, the Court awards prejudgment interest despite the fact that the Plaintiff, in neither his complaint nor in his Proposed Findings of Fact and Conclusions of Law, nor in the

---

[37] Federal Reserve Statistical Release, H.15 Selected Interest Rates, http://www.federalreserve.gov/releases/h15/current/h15.htm (last visited June 3, 2011).

Pre-Trial Statement, expressly requested prejudgment interest. Prejudgment interest will therefore accrue from March 29, 2010 through the date of this Court's Judgment, but only on the Plaintiff's actual damages of $7,477.10, not on the Plaintiff's punitive damages of $33,333.33.

    2.    <u>Post judgment Interest</u>

Federal law authorizes this Court to award post judgment interest on any money judgment. 28 U.S.C. § 1961(a) specifically provides that interest is allowed on "any money judgment in a civil case recovered in a district court" at the rate of the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." This provision has been interpreted to mean that "once a judgment is obtained, interest thereon is mandatory without regard to the elements of which that judgment is composed." *Laffey v. Nw. Airlines, Inc.*, 740 F.2d 1071, 1103 (D.C. Cir. 1984); *La. & Ark. Ry. v. Pratt*, 142 F.2d 847, 849 (5th Cir. 1944). Federal courts have routinely held that a bankruptcy proceeding is a "civil case" under 28 U.S.C. § 1961(a) and, thus, judgments in bankruptcy proceedings are subject to post judgment interest as provided by this section. *In re Pester Refining Co.*, 964 F.2d 842, 849 (8th Cir. 1992) ("Because a bankruptcy court is part of the district court, the statute applies to bankruptcy proceedings."); *Ocasek v. Manville Corp. Asbestos Disease Compensation Fund*, 956 F.2d 152, 154 (7th Cir. 1992); *In re A.S.M., Inc.*, 110 B.R. 802, 806 (Bankr. W.D. Tex. 1990). Accordingly, the Court concludes that the Plaintiff is entitled to recover post judgment interest on all of his damages in this suit calculated according to the Treasury yield under 28 U.S.C. § 1961(a). This interest will begin accruing on the amount of the Plaintiff's damages from the date the judgment is entered until the date the judgment is satisfied in full. The Court makes this conclusion despite the fact that the Plaintiff, in neither his complaint nor in his Proposed

Findings of Fact and Conclusions of Law, nor in the Pre-Trial Statement, expressly requested post judgment interest. Unlike prejudgment interest, which accrues only on the Plaintiff's actual damages, the post judgment interest will accrue on both actual damages and punitive damages.

      3.     <u>Attorneys' Fees</u>

"[T]o be entitled to recover attorneys' fees in an adversary action, a party must request attorneys' fees in its pleadings or otherwise place its counterparty on notice that attorneys' fees are being sought." *Suarez v. Smith (In re IFS Fin. Corp.)*, No. 02-39553-H1-7, 2010 WL 1992579, at \*5 (S.D. Tex. May 18, 2010). Here, the Plaintiff failed to do either. Accordingly, the Court concludes that the Plaintiff is not entitled to recover the attorneys' fees that he has incurred for the prosecution of this adversary proceeding.

## VI. CONCLUSION

"The price one pays for participation in a civilized society is the abandonment of the reaction of the jungle*." In re Trudeau*, 35 B.R. at 188. Here, the Debtor's savage blow on the extremely inebriated Plaintiff takes a page out of Sir William Golding's Lord of the Flies—for that one night, "[t]he world, that understandable and lawful world, was slipping away." William Golding, Lord of the Flies 91 (First Perigree premium ed., 2006) (1954). According to the testimony of not only the Debtor, but also Ms. Wise, Ms. Rocher, and Logsdon, the Plaintiff had verbally abused and also shoved the Debtor. Such actions while childish, annoying, and repugnant, are nevertheless insufficient to justify the heavy punch to the mouth that the Debtor threw and squarely landed.

The Debtor could have quickly walked away from the Plaintiff, particularly because the Debtor and the Plaintiff were outside and not surrounded by anyone or anything that could have prevented the Debtor from distancing himself from the Plaintiff. Indeed, by the Debtor's own

account, as well as the testimony of Ms. Rocher, Ms. Wise, and Logsdon, the Plaintiff was highly intoxicated and slurring his speech—a physical condition that would have prevented him from being able to catch up with the Debtor if the latter had simply turned and quickly walked in the opposite direction of the Plaintiff. "[N]o matter how provocative an essentially verbal confrontation may be in psychological fact and even if it is compounded by some physical contact not amounting to a significant battery, society cannot permit the passions to be unbridled." *Wilson v. State*, 7 A.3d 197, 233 (Md. Ct. Spec. App. 2010). These are the circumstances surrounding this dispute. Accordingly, the Court concludes that the Debtor's punch to the Plaintiff's mouth constitutes a willful and malicious injury by the Debtor to the Plaintiff. Accordingly, the Court concludes that the medical costs of $7,477.10 incurred by the Plaintiff in treating the damage resulting from the punch, plus the punitive damages of $33,333.33, plus prejudgment and post judgment interest, constitute a debt owed by the Debtor to the Plaintiff that is not dischargeable.[38]

In closing, this Court notes that the Debtor has filed for Chapter 7 to obtain a discharge of debts that reflect a lifestyle based upon high risk. The Debtor's schedules reflect that he has made woeful investments in real estate ventures in Florida and, as a result, owed several million dollars as of the date of the filing of his bankruptcy petition. [Main Case, Doc. No. 1, Schedules A & D]. The Debtor's schedules also reflect that he has gambling debts in excess of $60,000.00. [Main Case, Doc. No. 1, Schedule F, p. 28]. In punching the Plaintiff as hard as he could, the Debtor took yet another risk: namely, that he could maul the Plaintiff and walk away from the consequences. The trial of this adversary proceeding shows that the Debtor has been woefully incorrect in this assessment. The Debtor now owes the Plaintiff the amount of $40,810.43, plus

---

[38] All debts relating to a damage award, including punitive damages, are nondischargeable. *Gober v. Terra+Corp (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir. 1996).

interest, and this amount is nondischargeable—which means the Debtor is going to have a very difficult time walking away from the Plaintiff. The Debtor might want to reassess his risky lifestyle in the future, and perhaps abide by the old English adage that "the best throw of the dice is to throw them away."

A judgment consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 8th day of June, 2011.

Jeff Bohm
United States Bankruptcy Judge